No. 30,778.

JOSEPH KITTREDGE, *Plaintiff*, v. T. B. BOYD, Treasurer of State, etc., et al., *Defendants*.

No. 30,779.

THE MERIDEN TRUST & SAFE DEPOSIT COMPANY, etc., *Plaintiff*, v. T. B. BOYD, Treasurer of State, etc., et al., *Defendants*.

No. 30,799.

THE OLD COLONY TRUST COMPANY, of Boston, Mass., et al., *Plaintiffs*, v. T. B. BOYD, Treasurer of State, etc., et al., *Defendants*.

(18 P. 2d 563.)

Opinion filed January 28, 1933.

*M. A. Gorrill* and *Henry H. Asher,* both of Lawrence, for the plaintiffs; *Thomas Amory Lee,* of Topeka, of counsel.

*Roland Boynton,* attorney-general, *Everett E. Steerman,* assistant attorney-general, and *Ernest E. Blincoe,* attorney for the state tax commission, for the defendants.

The opinion of the court was delivered by

DAWSON, J.: In these three cases plaintiffs invoke our original jurisdiction in mandamus to require the state treasurer to repay certain moneys exacted from defendants under color of the inheritance tax law and paid under protest. The members of the state tax commission are impleaded for whatever concern they may have in this litigation.

The issues of law are developed by pleadings and an agreed statement of facts. In case No. 30,779 it appears that on May 30, 1930, one Etta Warren Minuse, a resident citizen of Connecticut, died testate, seized of 107 shares of common stock and 120 shares of preferred stock in a Kansas corporation, the Santa Fe railway, worth $36,582.63. The state tax commission, acting in its capacity as the inheritance tax commission, levied an assessment of $1,002.79 upon the right of the beneficiaries of the testator's estate to have these shares of stock transferred to them upon the books of the corporation.

This sum was paid, under formal protest, by draft drawn in favor of the state treasurer and delivered to the inheritance tax commission, surrendered by that commission to the state treasurer, cashed by him, and the proceeds placed in a state depositary as a special account designated "the protested inheritance and special tax account."

In case No. 30,778 the action is to require repayment of $171.94 exacted and collected under similar circumstances from the executor of the estate of one Frances B. Kittredge, a resident citizen of Massachusetts, who died testate owning twenty-two shares of common stock and two shares of preferred stock in the Santa Fe railway, valued at $5,777.50.

In case No. 30,799 the action is to require repayment of $176.51 similarly exacted and collected from the executor of the estate of Malcolm Graeme Haughton, a resident citizen of Massachusetts, who died testate owning twenty-five shares of common stock of the Santa Fe railway, valued at $5,425.

After these assessments were paid under protest the supreme court of the United States decided that shares of stock in a corporation created in one state belonging to the estate of a decedent domiciled in another state are not subject to an inheritance tax in the state where the corporation was created, but only to such a tax in the state of the owner's domicile. (*First National Bank v. Maine*, 284 U. S. 312.) It is not contended by counsel that the Maine case is distinguishable from those at bar; and so it must be held that the shares of stock in the Santa Fe railway, a Kansas corporation, which belonged to the estate of Etta Warren Minuse, who in her lifetime was a resident citizen of Connecticut, were not subject to an inheritance tax in Kansas, and the assessment of $1,002.79 imposed and collected on those shares of stock was illegal. Similar illegality inheres in the assessment and collection of inheritance taxes in cases Nos. 30,778 and 30,799, from the estates of the other Santa Fe stockholders who died resident citizens of Massachusetts. And being illegal exactions and paid under protest, what is to prevent the return of those undistributed tax moneys now in the hands of the treasurer? Counsel for defendants urge various objections. These will be considered in order.

1. It is first contended that mandamus is not the proper remedy— that plaintiff has a plain and adequate remedy at law. In this jurisdiction where the desideratum of the litigation is merely to obtain an authoritative determination of some purely legal question for the

guidance of public officers mandamus has become the familiar vehicle to accomplish that objective. In *State, ex rel., v. State Highway Comm.,* 132 Kan. 327, 334, 295 Pac. 986, it was said:

"The use of mandamus to secure a speedy adjudication of questions of law for the guidance of state officers and official boards in the discharge of their duties is common in this state. (R. S. 60-1701, 60-1702.) Our conceptions of the proper use of mandamus to expedite the official business of the state have expanded far beyond the ancient limitations of matters justiciable in mandamus. (Citations.)"

Whether mandamus is available to plaintiff or not, it seems · rather clear it has no other plain and adequate remedy at law. Should plaintiff bring an action against defendants officially or personally, or in both capacities, for moneys had and received under a mistake of law? Will an ordinary action lie for the recovery of money which has been paid under a mere mistake of law? And if judgment were recovered, how would it be collected? By levy and execution on defendants' property? Or on state property? It occurs to us that these intruding questions answer themselves and effectively dispose of the suggestion that another adequate remedy is available. Having exacted this illegal demand from plaintiff, having accepted payment thereof under protest, having refrained from turning the money into the general revenue fund where it ought to have gone if it had been lawfully due and lawfully·exacted, so far as this case turns on a mere question of procedure we must hold that mandamus is a proper remedy.

2. The next contention is that the members of the tax commission are not proper parties. The practice in cases analogous to this has been to bring in these officials, not particularly because they have been necessary parties, nor strictly proper parties, but on the broad view that important adjudications in matters of taxation cannot be safely and assuredly announced without their wise contribution to such matters of public concern which call for authoritative determination. Mayhap in this case the tax commissioners are not necessary parties. It can hardly be said they are not proper parties. (*State v. Dolley,* 82 Kan. 533, 108 Pac. 846; *Wolf River Drainage Dist. v. Nigus,* 133 Kan. 742, 3 P. 2d 648.) Even if we should dismiss these tax commissioners out of this lawsuit as defendants we would feel constrained to ask them to remain in it as *amici curiæ* that we might have their informed and helpful advice on the questions at bar.

3. The next proposition urged is that this is a suit against the state of Kansas and, therefore, not maintainable, because the legislature has never authorized such a proceeding. It is quite correct that the state cannot be sued without legislative consent, and, of course, no consent has been given that the state may be sued to recover money rightfully in the state treasury where that money is subject to legislative disposition. It takes an act of the legislature to appropriate public funds, and they cannot otherwise be disbursed. But the money which plaintiff seeks to have repaid to it is not public money. It is plaintiff's money paid under protest. An act of the legislature appropriating this particular sum of money would be void. It is not subject to legislative disposition. The legislature can prescribe the procedure to be followed for the recovery of money belonging to a private citizen which has gotten into the hands of a public officer involuntarily; but it cannot appropriate that money to the general revenue, or to the school fund, or disburse it for legislative expenses. Even where a suit will lie against the state under sanction of statute, a judgment against the state has to be paid out of some fund belonging to the state and subject to legislative disposition as provided by law either before or after the judgment is rendered. Counsel for defendants cite decisions from other jurisdictions which hold that actions not materially different from the one at bar were held to be against the state and therefore not maintainable in the absence of a statute to sanction them. Among those cited is *Chemical Co. v. Board of Agriculture*, 111 N. C. 135. In that case, while the court held that it was subject to the objection that it was an unauthorized suit against the state, the opinion suggested that plaintiff had another remedy. Moreover, that action was not begun until the illegal tax money had been merged into the general fund of the state. In such a situation, under our practice, the plaintiff would probably have to go to the legislature for relief. In *Tyler v. Dane County* (Wis.), 289 Fed. 843, it was held that the illegally exacted money could be reclaimed from the state treasurer *personally*, but not against him officially, as in his latter capacity the action was one against the state. We do not believe defendants would wish this court to follow that decision in all its implications.

*Smith v. Loughman et al.*, 229 N. Y. Supp. 516, is also cited. That was a trial court decision, where it was held to be a suit against the state. However, as it progressed to a higher court, 226 App.

Div. 395, and eventually to the court of last resort, 253 N. Y. 565, the point that the suit was one against the state dropped out of the case completely.

The case of *Smith v. Reeves*, 178 U. S. 436, 44 L. Ed. 1140, is cited by defendants, but all it decided was that the fact that California had authorized the bringing of a suit against its state treasurer in one of its own courts to recover tax money illegally collected, did not imply its consent that the officer could be sued in any other court.

Before discussing our own practice we must remark that there is eminent authority for the view that where an illegal tax is paid involuntarily and under protest, an action timely begun to recover the money is not a suit against the state. In *Pennoyer v. McConnaughy*, 140 U. S. 1, is an instructive discussion of when and when not an action against a public official is a suit against the state. It was there said:

"The first class is where the suit is brought against the officers of the state, as representing the state's action and liability, thus making it, though not a party to the record, the real party against which the judgment will so operate as to compel it to specifically perform its contracts. (Citations.)

"The other class is where a suit is brought against defendants who, claiming to act as officers of the state and, under the color of an unconstitutional statute, commit acts of wrong and injury to the rights and property of the plaintiff acquired under a contract with the state. Such suit, whether brought to recover money or property in the hands of such defendants, unlawfully taken by them in behalf of the state, or for compensation in damages, or, in a proper case where the remedy at law is inadequate, for an injunction to prevent such wrong and injury, or for a mandamus, in a like case, to enforce upon the defendant the performance of a plain legal duty, purely ministerial, is not within the meaning of the eleventh amendment an action against the state. (Citations.)" (p. 10.)

In *German All. Ins. Co. v. Van Cleave*, 191 Ill. 410, the suit was against the insurance superintendent and the state treasurer to compel the superintendent to refund to complainants a certain illegal tax paid by them under protest, and to enjoin the treasurer from receiving the tax. From a judgment in the trial court in favor of defendants on legal questions, on appeal counsel for defendants sought to uphold the judgment on the ground that it was in effect a suit against the state. The supreme court held otherwise. Section 1 of the syllabus reads:

"The fact that money collected by the insurance superintendent as taxes eventually becomes the property of the state does not preclude a suit against him to compel him to refund such taxes, which were paid under protest, and to enjoin him from paying the same to the state treasurer and the latter from receiving them."

In the opinion it was said:

"Under the constitution the state can never be made a defendant in any court of law or equity, and it is argued in support of the decree that the bill cannot be maintained, because the insurance superintendent is an officer of the state, and, therefore, the suit is against the state. It is not denied that the state may specify any terms or conditions it pleases on which corporations of other states and foreign countries shall be permitted to transact business in this state. The legislature has fixed one of the conditions in this statute, and the only question involved in the suit is, what is the proper construction of the act? The state is not a defendant by name, and the suit does not relate to property owned by the state or which has ever reached its treasury. There is no attempt to recover money from the state, and the question involved is whether the state has authorized, by law, the insurance superintendent to exact the tax. A suit against him is not different, in any respect, from a suit against any other collector of taxes, and a party is not precluded from questioning the unauthorized act of a tax collector or other officer merely because the money collected will eventually reach the state." (p. 413.)

Another case frequently cited in the law books where our present question has been considered is *Scottish U. & N. Ins. Co. v. Herriott*, 109 Ia. 606, the last three paragraphs of the syllabus of which read:

"A suit by a foreign insurance corporation against the state treasurer in his official capacity to recover taxes collected by him under Code, 1897, section 1333, requiring all insurance companies to pay to the state a certain percentage of the premiums received on business done in the state as a condition of their right to do business within its limits, is not a suit against the state.

"Where a state officer, acting under the authority of a law, receives taxes paid to him under duress and protest, an action will lie against him for the recovery of the same if the law is invalid, although he has placed the money to the credit of the state.

"The payment, by a foreign corporation, under protest, of a license tax imposed by a state law claimed to be unconstitutional, will not be deemed voluntarily made when it was compelled by threat of the auditor, of which the treasurer knew, to pay in order to protect its property and continue its business in the state."

Another notable case was *Dennison Mfg. Co. v. Wright*, 156 Ga. 789, where the plaintiff company which, by compulsion of the penal code and under protest, had paid a license tax brought suit against the comptroller-general for its recovery. On behalf of the comptroller-general, the attorney-general contended that the action was one to enforce a liability against the state, but the court said:

"We do not construe this action as one brought against the defendant in his official capacity, but as an action against him individually for an act which, while done in his official capacity, was wholly without lawful authority and beyond the scope of his official power." (p. 793.)

In the headnotes it is said:

"The action in this case is not one against the defendant in his official capacity and to enforce a liability against the state, but is one against him individually for an act which, while done in his official capacity, was wholly without lawful authority and beyond the scope of his official power. For this reason the petition was not demurrable on the ground that the action was one against the state, which could not be brought without its consent." (Syl. ¶ 1.)

In this state a practice has been developed out of our expansive use of mandamus and the declaratory-judgment act for some public officer who has come into possession of money under color of his office to serve in the rôle of defendant and official stakeholder so as to procure a speedy and authoritative determination of the state's right to the money. Sometimes the attorney-general prosecutes the action; sometimes he elects to appear as counsel for defendants. Ordinarily, however, neither court, counsel nor litigants entertain the notion that such an action is one against the state, or one which seeks to fasten a liability on the state, or to draw public money out of the treasury without a specified appropriation as the constitution requires. Typical of this practice was *State, ex rel., v. Akers*, 92 Kan. 169, 140 Pac. 637, where, under a new statute imposing a royalty for sand taken from public streams for commercial purposes, the various sand companies paid over to the state treasurer, under protest, the sums exacted from them under color of the statute. Under the statute the royalty tax was to inure to the benefit of the general revenue; but acting under direction of the executive council the treasurer took charge of the sand royalties as "custodian" and kept them in a separate account designated as the "river fund;" and a record of the account was similarly kept by the state auditor, awaiting some authoritative determination of the legality

of the statute under which the moneys had been paid. To procure such a determination the attorney-general brought mandamus against the treasurer and auditor to require these moneys to be turned into the general revenue fund and their accounts to be kept accordingly. Some dozen or more sand companies were impleaded because of their interest in these royalty moneys which they had paid under protest. The impleaded sand companies carried the burden of the defense until the end of the litigation. (*Wear v. Kansas,* 245 U. S. 154, 62 L. Ed. 214.)

In *State, ex rel., v. Cumiskey,* 97 Kan. 343, 155 Pac. 47, mandamus was invoked to settle the validity of a statute under which the state oil inspector had collected a lot of money. The oil companies which had paid this money under protest were impleaded. The statute was held void, and in the conclusion of the court's opinion it was ordered:

"The inspection fees paid by various defendants under protest should be returned to them. The provisions of the law were such as to coerce inspection, and as a consequence the payment of inspection fees. The statute did not provide for the payment of a reasonable inspection fee, and no officer of the state had authority to accept less than the statutory fee if tendered. There being no valid law for the collection of any sum as an inspection fee, the state has no right to retain the funds indicated. The peremptory writ is denied, and the custodian of the sums referred to as paid under protest is directed to return them to the proper parties." (p. 353.)

In *State, ex rel., v. Ross,* 101 Kan. 377, 166 Pac. 505, the state superintendent of public instruction collected certain fees paid under protest by exhibitors of moving pictures under the censorship statute of 1913, and was made defendant in mandamus proceedings to determine the validity of the statute.

An analogous case, where the clerk of this court served as official stakeholder pending a determination of the validity of the statute under which money was exacted from litigants, was *State, ex rel., v. Railway Co.,* 87 Kan. 348, 125 Pac. 98; and see, also, *City of Hutchinson v. Hutchinson Gas Co.,* 125 Kan. 346, 353, 354, 264 Pac. 68.

Not to extend this phase of the case to greater length, a correct answer to the question whether an action is one against the unconsenting state when one of its officers or boards is made defendant can ordinarily be determined by the court of judgment which may possibly be rendered in the action. Can the state be subjected to the

payment of money, or can it be made to suffer any diminution of its sovereignty. If the judgment or relief prayed for can possibly have such effect it is, of course, a suit against the state. If not— if all that can possibly flow from the judgment is that the public official or official board shall be required to refund or release money or property of which plaintiff has been wrongfully deprived, and if the money or property is still under the control of the officer or board—the action is not to be regarded as one against the state. We note that some courts which have reached this same conclusion place it partially, at least, on the ground that the action is really not one against the officer but one against the individual who happens to be the officer. Without squarely disapproving that theory, we content ourselves by citing our own rule that where public officers are made defendants in actions which call for the construction of statutes to guide them in the discharge of their official duties, they are not subjected to personal judgments or otherwise penalized, although they may be defeated in such actions, where their defense was made in good faith. (*Hicks v. Davis,* 100 Kan. 4, 163 Pac. 799; *Cates v. Knapp,* 104 Kan. 184, 186, 187, 178 Pac. 447; *State, ex rel., v. Bone,* 125 Kan. 818, 838, 266 Pac. 85.) The rule, of course, is quite the contrary where the officer acts oppressively. (*King v. Wooster,* 111 Kan. 625, 627, 208 Pac. 799.) The present actions cannot be regarded as suits against the state.

4. The next point raised in defendants' brief relates to the question whether the statute under which the tax imposed on plaintiff for the transfer of the Santa Fe stock was unconstitutional. In this connection counsel for defendant cite our own decisions upholding this feature of the statute, and cite also *Blackstone v. Miller,* 188 U. S. 189. But *Blackstone v. Miller* was expressly overruled in *Farmers Loan Co. v. Minnesota,* 280 U. S. 204, 65 A. L. R. 1000, decided on January 6, 1930, two months before our legislature enacted its latest amendment to our statute relating to legacies and successions. (R. S. 1931 Supp. 79-1501a *et seq.*) Thus *Blackstone v. Miller* and our own decisions to like effect must go into the discard in view of *Bank v. Maine,* cited early in this opinion; and it would serve no purpose to dwell further on this point.

5. The next contention is that the tax was not paid involuntarily. This is a subject which has often been considered by the court and calls for no further elaboration at this time. See *Bank of Holyrood v. Kottmann,* 132 Kan. 593, 296 Pac. 357, and citations; *First Na-*

*tional Bank v. Sheridan County Comm'rs,* 134 Kan. 781, 8 P. 2d 312. Since plaintiff could not satisfy the federal inheritance tax, nor proceed further with the administration of the testate's estate until this state's illegal demand was complied with for the nonce, it must be held that the tax was paid involuntarily. And the same holding should be made touching so much of the tax as was collected pursuant to the agreement between plaintiff, the inheritance tax commission and the attorney-general, touching the proper amount required to satisfy the state's demand on the contingent remainder. The agreement was concerning the amount, not the legality, of the tax. The statute sanctions such agreements (R. S. 79-1505), and it would be a grievous oppression to require the testate's estate to be kept open indefinitely to avoid the payment of the illegal tax because it was not strictly due until the contingent interest should materialize.

6. A final question propounded by defendants is this: If the tax was levied and paid under an unconstitutional statute and paid involuntarily, should it be returned to the taxpayer? The proponents take the negative of this question and cite the provision of the constitution which says that no money shall be drawn from the treasury except in pursuance of a specific appropriation made by law. (Art. 2, § 24.) Of course, if this were a case of ordinary indebtedness, that provision of the constitution would govern. Indeed, if the money sought to be refunded in this proceeding had found its way into the general revenue fund of the state, although it was an illegal exaction, the same constitutional provision would probably govern. But here the money never reached the treasury in any real sense. It was halted in the hands of the public officer by being paid under protest, and by that officer's course of dealing with it. He did not turn it into the treasury to the credit of the general revenue fund where all such tax moneys lawfully paid without protest do go. He placed the money in a special account designated "the protested inheritance and special tax account," so as to pave the way for litigation over its legality. Under the agreed statement of facts (paragraph 26) this money "does not appear upon the books of the state auditor as distributed to any fund or funds of the state of Kansas." It thus appears that the money is not in the treasury where a statute drawn pursuant to article 2, section 24 of the constitution would reach it. As we have already said, the legislature has power to prescribe methods whereby money which

does not belong to the state can be refunded to its owners, but the legislature has no power to appropriate money that does not belong to the state. This is no new question in this court. In *Lehnherr v. Feldman,* 110 Kan. 115, 120, 202 Pac. 624, it was said:

"There are many separate funds in the hands of the state treasurer, which he holds only as a convenient custodian, such as the bank guaranty fund, fiscal agency funds, cash deposits for the faithful performance of contracts, and the like, which do not require legislative appropriations in order for the treasurer to disburse them."

See, also, *State, ex rel., v. Thompson, Treasurer,* 115 Kan. 457, 223 Pac. 258.

We have now labored through the objections to plaintiff's cause of action which counsel for defendants have exhaustively briefed and argued for our instruction. Our conclusion is that none of them would justify our refusal to grant the relief sought. Plaintiff is entitled to judgment.

Cases Nos. 30,778 and 30,799 are similar in all material respects to case No. 30,779. They require no separate discussion, and judgment in each of them must likewise be for plaintiff.

Writs in all three cases are allowed.

THIELE, J., not participating.