No. 31,711

Helen C. Frick et al., Executors of the Estate of Henry C. Frick, Deceased, *Appellants*, v. The State of Kansas, The Inheritance Tax Commission of the State of Kansas et al., *Appellees*.

(32 P. 2d 221.)

Opinion filed May 5, 1934.

*Charles H. Brooks, Willard Brooks, Howard T. Fleeson,* all of Wichita, and *Thomas Amory Lee,* of Topeka, for the appellants.

*Roland Boynton,* attorney-general, *Everett E. Steerman,* assistant attorney-general, and *W. B. Crowther,* of Salina, for the appellees.

The opinion of the court was delivered by

Burch, J.: The proceeding in the district court was one by executors of the estate of a nonresident of this state for review of an order of the state tax commission refusing to abate succession taxes paid to the state treasurer. The district court sustained a demurrer to the application for review, and the executors appeal.

Henry C. Frick, a resident of the state of Pennsylvania, died testate on December 2, 1919. His will was duly probated in the county of his residence, and executors of the estate were appointed. Included in the Pennsylvania assets of the estate were 77,640 shares of the common stock of the Atchison, Topeka & Santa Fe Railway

Company, a Kansas corporation, having its principal office in Topeka. The share certificates had not been in the state of Kansas subsequent to their issue, and were in possession of the decedent at his domicile at the time of his death. There was no administration of the estate or any part of it in Kansas.

On April 18, 1921, and pursuant to the statute of this state relating to the subject, the tax commission assessed a succession tax, which the tax commission ordered paid to the state treasurer. On April 23, 1921, the executors paid the tax, in the sum of $353,887.04, to the state treasurer. In May, 1932, the Frick estate not having been closed, the executors petitioned the state tax commission for an order abating the tax. As indicated, the petition was denied, and on November 4, 1932, the application for review was filed in the district court. The occasion for the petition for an order of abatement was the decision of the supreme court of the United States in the case of *First National Bank v. Maine*, 284 U. S. 312 (January 4, 1932).

At the time the tax was assessed and paid, the assessment and payment were justified by the decision in the case of *Blackstone v. Miller*, 188 U. S. 189 (January, 1903). In June, 1925, the supreme court of the United States rendered a decision in the case of *Frick v. Pennsylvania*, 268 U. S. 473, which directly involved the succession taxes already paid to the state treasurer of Kansas, and which are the subject of the present controversy. In the opinion it was said:

"The decedent owned many stocks in corporations of states other than Pennsylvania, which subjected their transfer on death to a tax and prescribed means of enforcement which practically gave those states the status of lienors in possession. As those states had created the corporations issuing the stocks, they had power to impose the tax and to enforce it by such means, irrespective of the decedent's domicile and the actual situs of the stock certificates. Pennsylvania's jurisdiction over the stocks necessarily was subordinate to that power. Therefore to bring them into the administration in that state it was essential that the tax be paid. The executors paid it out of moneys forming part of the estate in Pennsylvania and the stocks were thereby brought into the administration there. We think it plain that such value as the stocks had in excess of the tax is all that could be regarded as within the range of Pennsylvania's taxing power." (p. 497.)

To illustrate nature of the tax, and provisions adopted for enforcing it, the Kansas statute then in effect was cited in the margin of the opinion at page 497.

The foundation of the decisions in *Blackstone v. Miller* and *Frick v. Pennsylvania* was shaken by the decision in *Safe Deposit & T. Co. v. Virginia,* 280 U. S. 83 (November, 1929), and was virtually demolished by the decision in *Farmers Loan Co. v. Minnesota,* 280 U. S. 204 (January, 1930). Up to that time, payment of succession taxes in Kansas on transfer of shares of stock of Kansas corporations, owned by nonresidents, had been voluntary. Those decisions were so significant that subsequent payment of the tax was frequently made under protest, on the ground the tax was illegal. After the decision in the Maine case, payment of the tax was generally protested.

In an effort to make a case of compulsion to pay the tax here involved, the executors pleaded necessity to pay in order to procure transfer of the shares to them on the books of the corporation, and so to acquire administrative authority over them. The court is of the opinion the allegations were insufficient to show the payment was involuntary and, unless the legislature makes provision for return of illegal succession taxes voluntarily paid, the taxpayer is remediless.

In this state taxes on land become a lien on November 1 of each year. To avoid default, at least one-half the taxes must be paid by December 20, and the other half by June 20 of the succeeding year. If the taxes are not paid, collection is enforced by sale and deed. Payment of the taxes is not constrained by existence of remedy in case of nonpayment. Suppose the owner desires to use the land by way of mortgage, which, under the circumstances must be a first lien, or desires to sell the land to a purchaser who requires a warranty against all liens. The owner pays the taxes. The state has not threatened him with coercive process, the payment gains for the owner a desired benefit to him, and the payment is voluntary. If this were not true, all taxes would be paid under duress. Ordinarily, to make payment of an illegal tax involuntary, there must be submission to the exaction under compulsion by the state, indicated by actual menace of wrongful invasion of interest, which creates immediate and urgent necessity for payment. Immediacy, however, may consist in inevitableness of coercive measures, rather than in nearness in point of time. (*Ottawa University v. Stratton,* 85 Kan. 246, 116 Pac. 892; *Bank of Holyrood v. Kottmann,* 132 Kan. 593, 296 Pac. 357; *First National Bank v. Sheridan County Comm'rs,* 134 Kan. 781, 8 P. 2d 312.)

In all these cases the taxes were paid under protest. An attitude of antagonism to payment of the tax was objectively manifested, and the same was true in the case of *Kittredge v. Boyd*, 136 Kan. 691, 18 P. 2d 563. If such an attitude does not exist, and payment is made as a routine matter in conduct of administration of an estate, it is difficult to see what it is that makes payment involuntary.

In this instance there was no indication of opposition to payment of the tax and, so far as appears, no desire to oppose was entertained. The statute under which the tax was assessed was similar to statutes in operation in many states. The application for review alleged payment of a succession tax in Pennsylvania. It appears from the opinion in *Frick v. Pennsylvania* that succession taxes on corporate shares originating in states other than Pennsylvania were paid, and benefit of the payments, including the payment made to Kansas, was claimed and allowed in Pennsylvania. Validity of the various state statutes was universally recognized, and nullification years later may not be used to give acquiescence at time of payment color of compulsion. The payment was made without protest, and protest is the common method of indicating nonacquiescence. Years passed before it occurred to the executors they had been forced to pay an illegal tax and, so far as the circumstances disclose, in paying the tax the executors were merely discharging what was recognized as a valid obligation to the state of Kansas, and were thereby discharging the quasi-lien on the shares to facilitate administration.

More than eleven years after the tax was voluntarily paid, plaintiffs petitioned the tax commission to abate the tax. The ground of the petition was that, as held in the Maine case, it was beyond the power of the legislature to impose the tax, and, consequently, all provisions in the inheritance tax law relating to imposition and collection of this class of taxes are and always have been utterly void. The ground is well taken, but the statute contains no provision authorizing abatement of the tax.

The inheritance tax law contemplates abatement of succession taxes, and the petition for abatement was based on R. S. 79-1517, which reads as follows:

"The inheritance tax commission shall determine the amount of tax due and payable upon any estate or upon any part thereof, and shall certify the amount so due and payable to the probate court and to the county treasurer and to the person or persons by whom the tax is payable; but in the deter-

mination of the amount of any tax said inheritance tax commission shall not be required to consider any payments on account of debts or expenses of administration which have not been allowed by the probate court having jurisdiction of the estate. Payment of the amount so certified shall be a discharge of the tax. Any executor, administrator, trustee or grantee who is aggrieved by any determination of said inheritance tax commission may, at any time before said estate shall be finally closed, and after the payment of such tax to the county treasurer, apply by petition to said inheritance tax commission for the abatement of said tax or any part thereof, and if said commission adjudge that said tax or any part thereof was wrongfully exacted it shall order an abatement of such portion of said tax as was assessed without authority of law. Upon final decision ordering an abatement of any portion of said tax the county treasurer shall refund from any legacy and succession taxes in his hands, the amount adjudged to have been illegally exacted, with interest at the legal rate, without any further act or resolve making appropriation therefor: *Provided, however,* That any such executor, administrator, trustee or grantee may apply to any district court of competent jurisdiction for a review of any such order, and until final decision shall be entered by any such court such money shall not be refunded by said county treasurer."

Plaintiffs say they rest their case entirely on this section of the statute. It will be observed the section does not relate to abatement of taxes paid to the state treasurer under order of the tax commission, and it would be easy to demonstrate that the section applies only to estates administered in probate courts of Kansas.

In this connection it may be observed that a probate court of Kansas cannot administer an "estate" unless there is an estate in Kansas to be administered. No probate court of Kansas had jurisdiction to administer any portion of the Frick estate unless it be the portion consisting of Santa Fe shares. The share certificates were chattels having situs in Pennsylvania for purpose of administration. In another aspect the certificates were evidence to the shareholder of certain rights, privileges and powers pertaining to the railway company as a corporation. The property of the railway company belonged to the corporation and not to the shareholders. Under well-settled law the bundle of rights, privileges and powers which constituted what we call property of the shareholder, attended his person at his domicile in Pennsylvania, acquired no other situs, and there was no "estate" to be administered in Kansas. The proceedings in probate courts relating to local estates of deceased residents might well be utilized in administration of the succession tax law, as the statute provided; but no probate court could exercise any probate jurisdiction with respect to the Frick estate, for lack of subject matter within its jurisdiction. Without

the fiction of situs in Kansas for purpose of taxation, no probate court in Kansas would have entertained jurisdiction to administer the estate, and that fiction has now been authoritatively exploded. This subject, however, it not vital to the decision, because there is a more fundamental reason why plaintiffs may not invoke R. S. 79-1517.

The section was framed under the conception the legislature possessed power to impose and collect succession taxes on all transfers of shares of domestic corporations having situs at the domicile of deceased residents of foreign states. The abatement provisions were inserted to permit correction of error and irregularity, to cure consequence of misinterpretation, and to remedy excess and abuse of power in administration of the statute as a valid law. The provisions were promulgated on the basis of validity of the statute, and not on the basis of invalidity. Considered as valid, there was no purpose that the statute might be used to get back taxes regularly assessed and voluntarily paid pursuant to the statute, and the abatement provisions had no function to fulfill in coping with consequences of invalidity. The decision in the Maine case definitely created an abnormal situation which was not within the contemplation of the legislature. The decision was rendered on January 4, 1932. Between March, 1919, and January 1, 1930, succession taxes invalidated by the decision were paid in the sum of $2,137,723. The total payments to May 29, 1933, amounted to $2,545,390. The subject of unexpected refunding, with interest at six per cent per annum as R. S. 79-1517 requires, of large sums of money supposedly legally collected and spent throughout a long period of years, was distinctly not dealt with. In particular, the state did not grant power to its tax commission to engage in wholesale issuance of orders abating taxes voluntarily paid long ago, on sudden nullification of the statute by overriding authority, and the state has not consented that it, or its taxing agencies as such, may be sued with respect to the condition of affairs consequent on nullification.

As suggested above, after the decision in the case of *Farmers Loan Company v. Minnesota,* in January, 1930, it was conceived by astute lawyers that the supreme court of the United States might reach the conclusion which it did reach in the Maine case, and in some instances tax payments were made under protest. After the decision in the Maine case, most payments were made under protest. In all these cases the state treasurer kept the money out of

the general revenue fund, where it would belong if property of the state, and placed it in a special depositary, in an account designated "protested inheritance and special tax account." This course of conduct gave opportunity for actions of mandamus by protesting taxpayers against the official stakeholder, to obtain relief. (*Kittredge v. Boyd,* 136 Kan. 691, 18 P. 2d. 563.) The case of *Boston Safe Deposit & Trust Co. v. Boyd,* ante, p. 411 (this day decided), was one of mandamus to require the official stakeholder to refund taxes paid involuntarily and under protest on September 9, 1930. One of the questions in the case was the time within which such an action might be commenced. It was held R. S. 79-1517 had no application, and the three-year statute of limitation governed.

As indicated, plaintiffs concede that if they may not recover by virtue of R. S. 79-1517, the proceeding to abate is not well founded. The court is of the opinion the section affords plaintiffs no remedy, and the judgment of the district court is affirmed.