STATE OF FLORIDA on the relation of Seaboard Air Line Railroad Company, a corporation organized under the laws of the State of Virginia, v. CLARENCE M. GAY, as Comptroller for the State of Florida.

35 So. (2nd) 403 January Term, 1948
May 7, 1948 En Banc
Rehearing denied June 1, 1948

*Ausley, Collins & Truett,* for petitioner.

*J. Tom Watson,* Attorney General, *D. Fred McMullen* and *Fred M. Burns,* Assistant Attorneys General, and *Lewis H. Tribble,* for respondent.

SEBRING, J.:

The relator, Seaboard Air Line Railroad Company (hereinafter referred to as the New Company) is a Virginia corporation duly authorized to do business in the State of Florida. Under a Plan of Reorganization approved by the Federal Courts in 1943 it has succeeded to the properties and equipment of Seaboard Air Line Railway Company (hereinafter referred to as the Old Company), which had been in the hands of Federal Court receivers since 1930. The properties and equipment are situated in six southeastern States, including the State of Florida.

Under the Plan of Reorganization there was constituted a Reorganization Committee empowered to consummate the reorganization. Prior to the approval of the Plan of Reorganization various other committees had been formed for the protection of holders of bonds and other securities of the Old Company, and these committees, in turn, had appointed depositaries to receive deposits of such bonds and securities and to issue certificates of deposit therefor.

Pursuant to the Plan of Reorganization the properties and equipment of the Old Company were sold under a foreclosure decree entered by the Federal Courts, and the Reorganization Committee became the purchaser. The reorganization Committee then entered into an agreement to convey these assets to the New Company upon the latter agreeing to issue bonds secured by mortgages upon the property, to or upon the order of the Reorganization Committee, to be exchanged, through the appointed depositaries, for the certificates of deposit issued by the latter for bonds and other securities of the Old Company.

In the execution of the Reorganization Plan the Reorganization Committee conveyed the property to the New Company and the latter made two mortgages to trustees, each bearing date January 1, 1946, and covering the property to be conveyed, to secure the payment of the bonds contemplated to be issued by the New Company in exchange for preexisting obligations of the Old Company. One of the mortgages in the principal sum of $32,500,000, and described as the "First Mortgage," was made to Maryland trustees. The other mort-

gage, in the principal sum of $52,500,000, and described as the "General Mortgage," was made to New York trustees.

None of the bonds issuable by the New Company was actually exchanged under the Plan of Reorganization for securities of the Old Company until after August 14, 1946. Subsequent to August 14, 1946 and prior to the institution of these proceedings, both First Mortgage bonds and General Mortgage bonds were issued to holders of securities of the Old Company as such creditors became qualified to receive them in exchange for certificates of deposit. As of August 14, 1946 the bonds deliverable to residents of Florida who were entitled to receive them under the Plan of Reorganization, were as follows: First Mortgage Bonds, Series A, in the principal amount of $250,987.94 and General Mortgage Bonds, Series A, in the principal amount of $473,917.18. These bonds were delivered to Florida residents subsequent to August 14, 1946 and prior to the institution of these proceedings.

On August 14, 1946, the trust mortgages executed by the New Company were presented to the proper recording officials in Florida for recordation. Upon the advice of the State Comptroller, the recording officials refused to admit the mortgages to record until there had been paid a 2-mill Class C intangible personal property tax on the $85,000,000 mortgage obligations, calculated on the proportionate value which the Florida real property bore to all the realty embraced in the two mortgages.

In order to get the mortgages recorded and thus perfect the mortgage liens on Florida property, and in anticipation of a refund under applicable statutes, the relator paid the taxes demanded, but under protest, the grounds of the protest being (a) that no bonds secured by the mortgages had been delivered to persons entitled thereto prior to the presentation of the mortgages for recordation and hence a tax could not be lawfully levied under applicable statutes until the delivery of the bonds was completed; (b) that if, as, and when the bonds should be finally delivered to persons entitled to receive them, said bonds, if coming within the tax jurisdiction of the State of Florida, should be classified and taxed in the hands of the holders thereof as Class B intangibles; (c) that

more than 99 per centum of the bonds secured by the mortgages were deliverable to citizens and residents of states other than the State of Florida and accordingly the State of Florida had no tax jurisdiction over them, the bonds having neither a domiciliary nor a business situs in this State for tax purposes.

After payment of the taxes under protest, the relator promptly instituted a mandamus proceeding for the purpose of securing a refund of the taxes paid. Upon a petition setting up the facts which we have recited, and containing the additional averment that if any Class C intangible tax was leviable at all under the circumstances the maximum amount thereof was measurable only by the aggregate principal amount of bonds deliverable to residents of Florida on August 14, 1946, this Court issued an alternative writ of mandamus directed to the Comptroller of the State of Florida, commanding him to refund the amounts paid under protest or show cause why he should not do so.

A motion to quash the alternative writ was filed by the Comptroller, and the matter is now before us for decision on the questions raised by the motion.

The first ground of the motion to quash is that mandamus is not the proper remedy to secure a refund of the taxes. It is said by the Comptroller that under the statutes authorizing refunds and prescribing the procedure to be followed in procuring them, the Comptroller is necessarily required to exercise a considerable degree of discretion in making the judicial or quasi-judicial determination of whether or not the tax should be refunded, and that hence the duty of allowing or rejecting the disputed tax claim cannot be controlled by a proceeding in mandamus.

Chapter 199 Florida Statutes, 1941, contains the statute law of the state specifically relating to the levy, collection and refund of intangible personal property taxes. Section 199.31 provides that all intangible personal property tax money collected by the various tax collectors of the State shall be remitted to the State Comptroller to be placed in a special fund designated as the "intangible tax fund." The section provides that "When money has been paid into the intangible tax fund

in payment of any intangible personal property taxes, whether payment was made voluntarily or involuntarily, the Comptroller is authorized and *directed* to refund to the person who paid same, or to his heirs, personal representatives or assigns: (a) Any overpayment; (b) Payment where no tax was due; and (c) Where a *bona fide controversy* exists between the tax collector and the taxpayer as to the liability of the taxpayer for the payment of the tax claimed to be due; the taxpayer may pay the amount claimed by the tax collector to be due and if it *is finally adjudged by a court of competent jurisdiction* that the taxpayer was not liable for the payment of the taxes, or any part thereof, *the Comptroller shall make such refund as the Court may direct.* . . . There is hereby appropriated annually, out of funds coming into the Comptroller's hands under the provisions of this chapter, an amount necessary to make such refunds."

The language of the statute is mandatory in its nature, particularly as regards the duty of the Comptroller·to make tax refunds in cases involving bona fide controversies in which courts of competent jurisdiction have directed that tax refunds be made. Certainly, the present dispute between the parties has been bona fide since its inception. The taxes were paid by the relator under protest and with the avowed intention of seeking a refund. Before proceedings were instituted, demand was made on the Comptroller for the return of the money paid, on grounds going to the constitutional and statutory right of the Comptroller to exact the tax payments. The claim for refund was denied by the Comptroller on the ground· that under the statutes relied on by relator, the taxes, as a matter of law, became due and payable as a condition precedent to the recordation of the mortgages. No questions of fact but only questions of law were, or are, involved in the ultimate determination of the controversy. Under the law as applied to the admitted facts of the case, the Class C intangible property tax is either payable in its entirety, is payable only as to bonds issuable to Florida residents, or is not payable at all; the liability or non-liability of the relator for the payment of the tax being entirely dependent upon the ultimate construction to be given the statutes by a court of

competent jurisdiction. If under the statutes no authority exists for the imposition of the Class C intangible property tax, either in whole or in part, under the facts stated in the alternative writ of mandamus and admitted by the motion to quash, then a clear legal duty is imposed upon the Comptroller to "make such refund as the Court may direct," out of a fund expressly established by the legislature and appropriated for that purpose. In essence, therefore, the accuracy or legality of the disputed claim is fixed by law and not dependent upon facts requiring the exercise of a discretion or determination as to the truth or falsity of the claim asserted.

Under modern practice the use of the writ of mandamus has been very generally expanded far beyond the ancient limitations of matters formerly thought to be justiciable in mandamus, and the writ has been frequently employed where, as here, the speedy determination of the purely legal questions involved will not only put the dispute between the parties at rest but also will furnish an authoritative guide for the conduct of the Comptroller in respect of like matters in the future. See 34 Am. Jur., Mandamus, Sec. 81, pp. 870, 871; Kittredge v. Boyd, State Treasurer, 136 Kan. 691, 18 P. (2nd) 563, 93 A.L.R. 574. As a matter of fact, the writ has been frequently employed in this jurisdiction for such purpose; although we cannot say that in any of our cited decisions the right to the use of the remedy has been challenged by motion, as is the case in the proceeding at bar. However, be that as it may be, we are of opinion that mandamus is the appropriate remedy to settle the purely legal question existing between the parties, and that the motion to quash the alternative writ on the ground asserted must be denied.

The next question raised by the motion to quash is with respect to the nature of the tax imposed by the statutes, and the property against which the tax is leviable. The respondent contends that under the applicable statutes the tax imposed as a condition precedent to recordation is upon the mortgages sought to be recorded, the amount of the tax being measurable by the debt or obligation secured by the mortgage; and that the mortgages being as to Florida real estate, it is without consequence that the bondholders, who are the own-

ers of the debt or obligation, are nonresidents of the State of Florida. In opposition to this contention the relator corporation maintains that under the Constitution of the State, and the statutes, the tax authorized to be imposed is upon the debt or obligation for which the mortgages were given as collateral security, and that consequently the domicile or business situs of the holders of the bonds is the controlling factor in determining whether or not the State of Florida may levy and impose a Class C intangible property tax and require it to be paid as a condition precedent to the recordation of the mortgages.

At the time of adoption of the Constitution in Florida an advalorem tax on intangible personal property was not contemplated. Such a form of tax was subsequently brought into the tax structure of the State by virtue of the adoption of section 1, Article IX of the Constitution, as amended in 1924 and 1944. Intangible property taxes are in no way affected by the provisions of Sections 2 and 5 of the Constitution relating to excise, license, or ad valorem taxes, the whole law for their imposition, collection and distribution being comprehended within Section 1 Article IX as amended. See State ex rel. Watson v. Lee, 157 Fla. 62, 24 So. (2nd) 798, 163 A.L.R. 862.

Section 1 Article IX of the Constitution, as amended, is as follows:

"The Legislature shall provide for a uniform and equal rate of taxation, except that it may provide for special rate or rates on intangible property . . . ; provided, that *as to any obligations* secured by mortgage, deed of trust, or other lien, the Legislature may prescribe an intangible tax of not more than two (2) mills on the dollar, which shall be payable at the time such mortgage, deed of trust, or other lien is presented for recordation, said tax to be in lieu of all other intangible assessments *on such obligations* . . . " (Italics supplied).

It is perfectly plain from the language employed in section 1 of Article IX of the Constitution, to the effect that the legislature may prescribe an intangible tax on obligations secured by mortgages and collect the same at the time the mortgages are presented for recordation, that it is the *obli-*

*gations or debts* which are to be taxed under the Constitution, and not the mortgages securing them. It is perfectly plain, furthermore, that the obligations or debts which are to be taxed and the tax paid when the mortgages are presented for recordation (instead of on January 1st of each year as in the case with other intangible property taxes) are to be only those obligations or debts which are secured by written liens on *Florida realty,* for as to mortgages on lands not situated in Florida, there would be no occasion or authorization for recording such mortgages in the public record books of Florida. It seems equally as plain that the *debt or obligation* on which the tax may be imposed and collected at the time the mortgage to secure it is recorded, must be a debt or obligation over which the State of Florida has acquired taxing jurisdiction through reason of the fact that the owner of the debt, or the written evidence of the debt itself, has acquired a domicile or business situs in this State for tax purposes; for it has long been the established rule of this jurisdiction, even prior to the constitutional amendment, that in contemplation of law, intangible personal property accompanies the person of the owner and is taxable at his domicile, unless it has acquired a business situs for taxation purposes elsewhere. See Hunt v. Turner, 54 Fla. 654, 45 So. 509; State v. Beardsley, 77 Fla. 803, 82 So. 794; Atlantic Coast Line R. Co. v. Amos, 94 Fla. 588, 115 So. 315; Henderson v. Usher, 118 Fla. 688, 160 So. 9; Atlantic National Bank of Jacksonville v. Simpson, 136 Fla. 809, 188 So. 636; Starkey v. Carson, 138 Fla. 301, 189 So. 385; Wood v. Ford, 148 Fla. 66, 3 So. (2nd) 490; Smith v. Lummus, 149 Fla. 660, 6 So. (2nd) 625.

What we have said with regard to Section 1 Article IX of the Constitution is likewise true with respect to the statutory law enacted pursuant to Section 1 Article IX.

Chapters 20724, 21943 and 28867, Laws of Florida, enacted respectively in 1941, 1943 and 1945, pursuant to Section 1, Article IX, contain the entire statutory law of this State with regard to intangible personal property taxes. This law now appears in Chapter 199 Florida Statutes, 1941. The taxes imposed under Chapter 199 are *ad valorem taxes* imposed against *intangible personal property.*

Intangible personal property is defined by section 199.01 as being "all personal property which is not in itself intrinsically valuable but which derives its chief value from the thing which it represents." By section 199.02, such property is classified, for the purpose of taxation, as Class A, B, C and D intangible personal property. Class C intangible personal property is defined by statute as being *"all notes, bonds and other obligations* bearing date subsequent to December 31, 1941, *for payment of money* which are secured by mortgage, deed of trust or other liens upon real property situated in Florida; provided that only that part of the value of the mortgage, deed of trust, or other lien, the real property of which is located within the State shall bear to the whole value of the real property described in said obligation shall be included." See Sec. 199.02 (3). Section 199.11, as amended, provides that on and after January 1, 1942 there shall be levied and assessed on all Class C *intangible personal property* two mills on the dollar of the taxable value of such property "which taxable value shall be the principal amount *of the indebtedness, evidenced by such obligation,* which tax shall be due and payable when the mortgage, deed of trust or other lien is executed and shall be paid to the county tax collector before the mortgage, deed of trust or other lien securing *such indebtedness* is presented for recordation. Every person who shall take, receive or record any mortgage, deed or trust or other written specific lien in the nature of a mortgage upon real property situated in Florida shall pay the tax prescribed by this subsection in respect to *the debt or obligation secured thereby. . . ."*

The statutes from which we have quoted levy and impose the Class C intangible property tax authorized by the Constitution upon a debt or obligation, or, at least, upon the written evidence of such debt or obligation in the form of notes, bonds, or other like promises to pay, as distinguished from a mortgage which may be given as collateral security for the debt or obligation.

It has been suggested by the respondent, in connection with this ground of his motion, that if the statutes cannot be construed as imposing a tax upon the mortgage, the tax may

be construed as a registration tax for the privilege of recording the mortgage, and that with such a construction placed upon the statutes the demand for the tax refund must necessarily be denied. The answer to this proposition is that the obligation of a citizen to pay taxes being purely of statutory creation, taxes can be lawfully levied, assessed, and collected only in the express method pointed out by statute. 51 Am. Jur., Taxation, Sec. 651, p. 617. An act, therefore, may not be construed to impose a tax unless its terms definitely so provide. The controlling statutes involved in the proceeding at bar are entirely devoid of any clear or express words of an intent to impose a tax for the privilege of recording the mortgages. See Jefferson Realty Co. v. Board of Commissioners, 156 Fla. 141, 23 So. (2nd) 274; Florida Industrial Commission v. Growers Equipment Co., 152 Fla. 595, 12 So. (2nd) 889; Lovett v. Lee, 141 Fla. 395, 193 So. 538. The legislature has denominated the tax an intangible property tax, that is to say, an ad valorem tax on personal property, and not a license or excise tax for the privilege of recording the mortgages. It has placed the tax upon the debt or obligation, or written evidences thereof, as required by Section 1 Article IX of the Constitution, and not upon the mortgages. For us to construe the tax as being of a nature other than that plainly designated by the legislature under its power derived from the Constitution; or to construe it as being one imposed upon a privilege and not upon property, or as imposed upon one type of property when the legislature has said that it should be imposed upon another, would amount to our reframing the statutes, not construing them. This we are not authorized to do; our only proper function being to interpret the law as it has been written by the legislature, not to recast it in the mold which we, perhaps, might like to have seen it written had we been responsible for its promulgation.

Having reached the conclusion that the tax imposed is upon the debt or obligation, or written evidences thereof, and not upon the mortgage, the next question is whether the debt or obligation—or at least so much thereof as is *not* represented by bonds deliverable to Florida residents—may be taxed under the Class C classification with respect to in-

tangible personal property, where the debt was contracted in another state, the bonds which are the written evidences of the debt are held by nonresident bondholders, and neither the bondholders nor the bonds have ever acquired a domicile or business situs in the State of Florida.

As we have said before, generally speaking, intangible personal property is taxable only at the domicile of the owner. In contemplation of law it accompanies the person of the owner and is taxable at his domicile. An essential and indispensable feature of the power of taxation is that either the owner of personal property be a resident, or that the property be situated within the district attempting to exercise the power to tax. See Hunt v. Turner, 54 Fla. 654, 45 So. 509; State v. Beardsley, 77 Fla. 803, 82 So. 794; Atlantic Coast Line R. Co. v. Amos, 94 Fla. 588, 115 So. 315; Henderson v. Usher, 118 Fla. 688, 160 So. 9; Atlantic National Bank of Jacksonville v. Simpson, 136 Fla. 809, 188 So. 636; Starkey v. Carson, 138 Fla. 301, 189 So. 385; Wood v. Ford, 148 Fla. 66, 3 So. (2nd) 490; Smith v. Lummus, 149 Fla. 660; 6 So. (2nd) 625. The fact that the indebtedness may be secured by a mortgage on real property situated in a State other than the domicile or business situs of the owner of the debt, will not give the indebtedness a tax situs in the state where the real property is located. See 26 R.C.L., Taxation, Sec. 253, p. 289; Cooley on Taxation, 19th Ed. Secs. 455 and 458. We conclude, therefore, that with respect to so much of the mortgage debt as was evidenced by bonds or other like obligations in the hands of or deliverable to nonresident bondholders, the State of Florida was without power to impose the Class C intangible tax and collect it at the time the mortgages were presented for recordation.

The final question confronting us is whether the bonds of the relator corporation in the principal amount of $725,905.12, which were deliverable to Florida residents on August 14, 1946, and which were secured by the mortgages on all the properties of the relator corporation, including the properties in Florida, could be taxed as Class C intangibles and the tax collected at the time the mortgages were presented for recordation. It is asserted by the relator corporation in briefs

that even though bondholders of the Old Company may have been entitled to receive bonds of the New Company on August 14, 1946 the bonds were not actually delivered until later; and that consequently no "obligations secured by mortgage" were in existence at the time the mortgages were presented for recordation and hence there was nothing upon which the Class C intangible tax could be lawfully imposed and collected.

As we understand the record, three different and distinct types of bonds were authorized to be issued by the New Company under the Plan of Reorganization, to persons entitled thereto by reason of the fact that they held either bonds of the Old Company or certificates of deposit issued by the approved depositaries in exchange for bonds of the Old Company. The two types of bonds secured by the First Mortgage were either to bear date as of January 1, 1946, or without regard to the date of delivery to persons entitled to receive them, were to bear interest as of January 1, 1946. While it is not entirely clear from the record just when the bonds to be secured by the General Mortgage were to be dated, or from what date they were to bear interest, it does appear from the language of section 2 Article One and section 1 Article Two of the General Mortgage that under certain specified conditions the entire authorized amount of $52,500,000 of bonds could be lawfully issued, on request, to bear date and interest as of January 1, 1946.

While it may be that as of the date that the mortgages were presented for recordation bonds under these mortgages had not actually been delivered to bondholders of the Old Company who were residing in Florida, the fact cannot be controverted that as of that date an indebtedness or obligation to pay existed in favor of such bondholders against the New Company. This obligation was secured by the mortgages on Florida property, and other property, to the extent of such indebtedness. The amount of such indebtedness was fixed definite and certain, and arose as the result of the acquiescence or consent of creditors of the Old Company in and to the Plan of Reorganization whereby the New Company became owners of the mortgaged property subject to the claims of said creditors. For aught that appears in the record to the contrary,

bonds of the New Company, bearing date prior to the recordation of the mortgages, were at that time in the hands of the depositaries for delivery to bondholders of the Old Company upon demand being made for such delivery. Whether upon the date the mortgages were recorded the bondholders of the Old Company had in their hands bonds of the Old Company, or certificates of deposit issued by the approved depositaries entitling them to bonds of the New Company, such creditors undoubtedly had upon that date a lien or claim, to the extent of their ownership in the aggregate debt, which was enforceable against the assets taken over by the New Company through the conveyance from the Reorganization Committee; and to that extent, at least, were holders of written obligations for payment of money, secured by mortgages on Florida property.

Therefore, under the peculiar facts of the case presented by the record, we hold that as of the time of the presentation of the mortgages for record there was due and owing and collectible as a condition precedent to recordation an intangible personal property tax on such of the bond obligations as were deliverable to bondholders in Florida in exchange for bonds of the Old Company or certificates of deposit representing bonds of the Old Company. To the extent, therefore, that the alternative writ of mandamus seeks a refund for the Class C intangible property tax paid at the insistence of the Comptroller on bonds deliverable to residents of Florida on or before August 14, 1946, the motion to quash the alternative writ must be granted and the relief denied; but as to the tax paid under protest on bonds delivered or deliverable to persons who were not residents of the State of Florida, or who had no business situs here, motion to quash the alternative writ must be denied and the respondent required to answer.

It is so ordered.

THOMAS, C. J., TERRELL and BARNS, JJ., concur.

CHAPMAN and ADAMS, JJ., dissent.