No. 46,827

THE FIDELITY INVESTMENT COMPANY, a Corporation, *Appellant*, v. JOHN HALE, Register of Deeds, Sedgwick County, Kansas, and LEE B. CONNELL, Consumer Credit Commissioner, *Appellees.*

(510 P. 2d 1236)

Opinion filed June 9, 1973.

*Herbert H. Hopper,* of Wichita, argued the cause and was on the brief for the appellant.

*Donald R. Hoffman,* assistant attorney general, argued the cause, and *Vern Miller,* attorney general, and *James P. Payne,* assistant attorney general, were on the brief for the appellees.

The opinion of the court was delivered by

HARMAN, C.: This is a declaratory judgment action challenging as to plaintiff the application and validity of the truth-in-lending act (K. S. A. 1972 Supp. 16-801, *et seq.*), particularly that part requiring annual payment of a fee based on volume of business (16-808 [g] [2] ). At issue is liability for fees for the years 1969 through 1973, inasmuch as the act has now been repealed and superseded effective January 1, 1974, by enactment of the uniform consumer credit code (SB 18) at the 1973 legislative session.

Plaintiff is a mortgage banker engaged in the real estate loan business. Defendants are the state consumer credit commissioner and the register of deeds of Sedgwick county. The latter was named in the proceeding because of his duty under our mortgage registration act (K. S. A. 79-3102).

The case was submitted for decision upon the following stipulation:

"STIPULATION OF FACT

"1. That the Fidelity Investment Company, a corporation, plaintiff herein, is a mortgage banker in the business of making loans secured by real estate mortgage including purchase money mortgages and first mortgages for purposes other than purchase money.

"2. The Consumer Credit Commissioner of the state of Kansas, a defendant herein, seeks to levy a tax or fee upon the plaintiff under the authority of K. S. A. 1970 Supp. 16-808 based on the volume of noncommercial loans made to individuals by the plaintiff.

"3. That eighty per cent (80%) of such amounts paid to the Consumer Credit Commissioner are used to enforce the Kansas Truth-in-Lending Act as to individuals coming under the act who are 'non-licensees,' and twenty per cent (20%) is paid into the state general revenue fund.

"4. The eighty per cent (80%) which the Consumer Credit Commissioner seeks to extract from the plaintiff will not all be spent in policing and regulating the activities of the plaintiff but will all be spent in enforcing the act as to all non-licensees.

"5. Plaintiff is not specifically exempted from K. S. A. 1970 Supp. 16-801 et seq. (Truth-in-Lending Act)

"6. The Truth-in-Lending Act is enforced as to banks, savings and loan associations and credit unions by their respective state commissions, but such lenders are not subject to the volume fee.

"STIPULATIONS AS TO ISSUES OF LAW

"1. Whether K. S. A. 1970 Supp. 16-801 et seq. applies to the plaintiff.

"2. Is the money to be paid under K. S. A. 1970 Supp. 16-808 a fee or a tax.

"3. Does the provision that twenty per cent (20%) of monies collected be paid into the state general revenue fund void the assessment as a revenue collection measure attempted under a police power.

"4. If it is a tax, is it a tax on the privilege of doing business or is it a property tax on the mortgage.

"5. If it is a mortgage tax, is the statute void as violating Article 11, Section 1 of the Constitution of the state of Kansas."

The trial court concluded the truth-in-lending act was applicable to plaintiff, that the charge contained in 16-808 (g) (2) was a fee for regulatory services and not a revenue raising measure or tax, and the provision for payment into the state general revenue fund of twenty per cent of the fees did not void the assessment as a revenue measure attempted under guise of the state's police power. The trial court further concluded that in view of these rulings it became unnecessary to decide the remaining issues presented in the stipulation.

From judgment rendered on the foregoing, plaintiff has appealed.

Appellant challenges the act's applicability to the type of loan

business it conducts on the ground such activity is not a "consumer" type loan as contemplated by the act. It asserts that as a mortgage banker it has no influence upon or control over the particular sales of real estate involved; that it makes loans to persons who already are the owners of the real estate at the time the loan is made, and also makes purchase money mortgages to those who have previously entered into a purchase contract with the owner of the property. It argues that in the first situation the borrower may have owned the property for years, either from purchase or inheritance, and the transaction has none of the attributes of a "consumer" type loan. In the latter instance—purchase money loans—the argument is the purchase phase of the transaction between the property owner and the purchaser has already been terminated before it as lender enters the picture, again an activity not contemplated by the act as one of consumer type. It contends the purpose of the act is to protect the consumer at the time of sale, that it is not a party to any sale contract, and furthermore, most mortgage bankers function as brokers only and within a thirty to sixty day period assign their mortgages to institutional lenders such as large insurance companies. Upon oral argument we are told by appellant's counsel that its loans primarily are upon residential property.

Our truth-in-lending law was enacted in 1969 and now appears as a part of K. S. A. 1972 Supp. Article 8. We turn to examination of pertinent parts. Section 802 provides:

"**Findings and declaration of purpose.** The legislature finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this Part to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."

Section 803 sets forth the following definitions:

". . .

"(c) The term 'person' means a natural person or an organization.

"(d) The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

"(e) The term 'creditor' refers only to creditors who regularly extend, or arrange for the extension of, credit for which the payment of a finance charge is required, whether in connection with loans, sales of property or services, or otherwise. The provisions of this act apply to any such creditor, irrespective of his or its status as a natural person or any type of organization.

"(f) The term 'credit sale' refers to any sale with respect to which is extended or arranged by the seller. . . .

"(g) The adjective 'consumer,' used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property or services which are the subject of the transaction are primarily for personal, family, household or agricultural purposes.

"(h) The term 'open-end credit plan' refers to a plan prescribing the terms of credit transactions which may be made thereunder from time to time and under the terms of which a finance charge may be computed on the outstanding unpaid balance from time to time thereunder."

Section 804 exempts certain transactions thus:

"The provisions of section 1 through section 29 [16-801 through 16-829] of this act shall not apply to the following: (1) Credit transactions involving extensions of credit for business or commercial purposes, or to governments or governmental agencies or instrumentalities, or to organizations. . . .

"(3) Credit transactions, other than real property transactions, in which the total amount to be financed exceeds twenty-five thousand dollars ($25,000)."

Section 805 gives to the consumer credit commission broad rule-making power to carry out the purposes of the act. This section also contains the following declaration:

". . . It is hereby declared to be the policy of this state that to the extent possible without constitutionally delegating legislative authority, that the commission is urged to give every consideration to the adoption of those regulations that are or may be promulgated by the federal reserve board on this subject. . . ."

Section 806 relates to determination of that which is denominated "finance charge in connection with any consumer credit transaction". Subsection (e) provides:

"The following items, when charged in connection with any extension of credit secured by an interest in real property, shall not be included in the computation of the finance charge with respect to that transaction:

"(1) Fees or premiums for title examination, title insurance or similar purposes.

"(2) Fees for preparation of a deed, settlement statement or other documents.

"(3) Escrows for future payments of taxes and insurance.

"(4) Fees for notarizing deeds and other documents.

"(5) Appraisal fees.

"(6) Credit reports."

Section 808 (a) charges various state agencies with administrative enforcement of the act as to licensees under particular state regulatory acts, such as consumer loan act, sales finance act, banking code, credit union act, savings and loan code in the case of state chartered savings associations and others. Subsection (c) provides

that except to the extent that enforcement of the requirements imposed under this act is specifically committed to some other state agency under subsection (*a*), the consumer credit commissioner shall enforce such requirements. Subsection (*e*) creates a consumer credit commission composed of the heads of various state agencies including the consumer credit commissioner. Subsection (*f*) provides:

"Any creditor or person making consumer credit sales, consumer leases or consumer type loans and any person having an office or place of business in this state who takes assignments of and undertakes direct collection of payments or enforcement of rights against debtors arising from credit sales, consumer leases or consumer loans, not regulated by one of the state agencies enumerated in subsection (*a*) above, for purposes of enforcement of the provisions of this act, shall be administered by the office of the consumer credit commissioner. Such creditors shall file notification with the consumer credit commissioner upon commencing business in this state, and thereafter, on or before January 1 of each year. . . ."

Subsection (*g*) provides in pertinent part:

"*Fees:* (1) A creditor required to file notification shall on or before January 1 of each year pay an annual fee of ten dollars ($10) for that year.

"(2) Creditors required to file notification who are sellers, lessors or lenders shall pay on or before January 31 an additional fee to be set by the commissioner not in excess of ten dollars ($10) for each one hundred thousand dollars ($100,000), or part thereof, in excess of one hundred thousand dollars ($100,000), of the original unpaid balances arising from consumer credit sales, consumer leases and consumer loans made within the preceding calendar year and held either by the seller, lessor or lender for more than thirty (30) days after the inception of the sale, lease or loan giving rise to the obligations, or by an assignee who has not filed notification. A refinancing of a sale, lease or loan resulting in an increase in the amount of an obligation is considered a new sale, lease or loan to the extent of the amount of the increase.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"(4) All moneys collected under this act shall be paid into the state treasury by the commissioner and shall be credited by the state treasurer as follows: Twenty percent (20%) thereof to the general fund of the state and the remaining eighty percent (80%) to a special fund, which is hereby created and shall be known as the 'non-licensee administration fund,' and which fund is hereby appropriated and made available to the commissioner for the purpose of paying the cost of administering and enforcing the provisions of this act as to non-licensees. The consumer credit commissioner, in preparing the budget of his office shall allocate the expenses of his office between the licenees and non-licensees in accordance with the dollar volume of consumer credit generated in the calendar year by licensees and non-licensees."

Section 815 establishes a general requirement of disclosure. Section 818 provides in part:

"Right of rescission as to certain transactions. (*a*) Except as otherwise provided in this section, in the case of any consumer credit transaction in which a security interest is retained or acquired in any real property which is used or is expected to be used as the residence of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the disclosures required under this section and all other material disclosures required under this act, whichever is later, by notifying the creditor, in accordance with regulations of the commission, of his intention to do so.

·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·

"(*d*) The commission may, if it finds that such action is necessary in order to permit homeowners to meet bona fide personal financial emergencies, prescribe regulations authorizing the modification or waiver of any rights created under this section to the extent and under the circumstances set forth in those regulations.

"(*e*) This section does not apply to the creation or retention of a first lien against a dwelling to finance the acquisition of that dwelling."

Section 822, relating to disclosure, provides:

"Consumer loans not under open-end credit plans. (*a*) Any creditor making a consumer loan or otherwise extending consumer credit in a transaction which is neither a consumer credit sale nor under an open-end consumer credit plan shall disclose each of the following items, to the extent applicable:

"(1) The amount of credit of which the obligor will have the actual use, or which is or will be paid to him or for his account or to another person on his behalf.

"(2) All charges, individually itemized, which are included in the amount of credit extended but which are not part of the finance charge.

"(3) The total amount to be financed (the sum of the amounts referred to in paragraph (1) plus the amounts referred to in paragraph (2)).

"(4) Except in the case of a loan secured by a first lien on a dwelling and made to finance the purchase of that dwelling, the amount of the finance charge.   .   .   ."

Section 828 prescribes certain conditions for the advertising of credit other than open-end plans. However, subsection (*b*) states:

"The provisions of this section do not apply to advertisements of residential real estate except to the extent that the commission may by regulation require."

Parenthetically it may be noted that the consumer credit commission has adopted a regulation which specifically makes certain types of realty credit transactions subject to Section 828 (see K. A. R. 77-2-9[*d*]).

Even cursory examination of the foregoing statutory provisions, with their many references, both direct and indirect, to loans upon and security interests in real property, makes it obvious the legislature intended the truth-in-lending act to be applicable to mortgages made by natural persons on real estate, subject, of course, to

the transactions specifically exempted, i. e., those in which credit is extended for business or commercial purposes (16-804[1]). Particular references need not be emphasized or labored since all point in the same direction; however, by way of illustration, two directly pertinent may be briefly mentioned: First, state chartered savings and loan associations are made subject to the act (16-808[a] [4])— such an institution by law makes loans on real property only, being expressly forbidden to make loans on tangible personal property "except when such property is used in the operation or management of real property upon which said association has a first lien, or where taken as additional security" (K. S. A. 1972 Supp. 17-5501 [s]); second, section 806(e) delineates certain items chargeable in connection with extension of credit secured by an interest in real property which are not to be included in the computation of the finance charge attributable to the transaction. Mentioned are items used in the transfer and mortgage of real estate.

Our truth-in-lending act, as well as those enacted by sister states, is patterned after the federal truth-in-lending act (see 15 U. S. C. A. § 1601, *et seq.,* 1973 PP., p. 173-214). Our limited research indicates that elsewhere the applicability of such an act to real estate mortgages has been taken for granted (see, e. g., *Jackson v. Consumer Credit Corporation,* 126 Ga. App. 106, 190 S. E. 2d 80; *Gardner & North R. & S. Corp. v. Board of Gov's., Fed. Res. Sys.,* 464 F. 2d 838 [DCCA, 1972]; *Bissette v. Colonial Mortgage Corporation,* 340 F. Supp. 1191 [DC, 1972]). In *Bissette* the plaintiff borrowers contracted to purchase a home from a third party, contingent upon their obtaining satisfactory financing. Subsequently defendant mortgage company financed plaintiffs in this purchase. Plaintiffs' suit was for damages for defendant's alleged failure to make timely disclosure under the act. In ruling for plaintiffs the court commented at footnote 3:

"While the issue is not directly raised, there is no question that the Act and Regulation Z apply to real estate transactions. H. R. Rep. No. 1397, 90th Cong., 2d Sess. 24-25 (1968). *See* Jensen, Effect of Federal Truth in Lending Act and Regulation Z on Real Estate, 4 Real Property, Probate and Trust Journal 11, (1969)." (p. 1192.)

Reference to the cited Congressional material reveals a history in the enactment of the federal truth-in-lending act indicating that real estate morgages are not exempt from its provisions, an exempting clause having been deleted during the course of its adoption. In passing we note also this further interpretation of the federal act

pursuant to a letter by the federal reserve board in whom administration and enforcement of the act is lodged, as stated in 1 CCH Consumer Credit Guide, ¶ 1005:

".78 **Personal v. business investments.**—Loans to individuals to purchase stock as personal investments probably are covered by the Act, as are loans for real estate investments which are clearly personal investments and are unrelated to the customer's normal business. However, loans to exercise stock options in closely held companies, or where real estate activities involve a significant portion of an individual's time might be classed as business loans.— *FRB Letter, May* 14, 1969, Consumer Credit Guide ¶ 30,026." (p. 3009.)

We think the factors urged by appellant in derogation of the act's applicability to it are irrelevant and we conclude that appellant in its real estate mortgage business extends credit of a type contemplated by our truth-in-lending act and we so hold.

Appellant next contends that the money to be paid under 16-808 (g) (2) and (4) is really a revenue raising measure or tax and not a fee. The argument continues, once it is decided that such assessment is really a tax, payment of further taxes is prohibited by reason of K. S. A. 79-3102 which calls for payment of a fee of twenty-five cents for each hundred dollars of the debt secured thereby upon the recording of any real estate mortgage, after payment of which registration fee the mortgage is not otherwise taxable. In contending the fees under 16-808 are taxes appellant focuses on the twenty per cent to go into the state general fund under subsection (4), and it cites and relies on two of our decisions, the latest being *Watson v. City of Topeka,* 194 Kan. 585, 400 P. 2d 689. There it was held that the police power of a city does not extend to the enactment of an ordinance whose principal purpose was the raising of revenue. The trial court had held as a fact that the charges sought to be imposed by the city's ordinance in reimbursement for its regulatory services were out of all proportion to the expenses involved. This finding being suported by evidence the ordinance was held void. Appellant cites also *Panhandle Eastern Pipe Line Co. v. Fadely,* 183 Kan. 803, 332 P. 2d 568, the story of which is best told by its syllabus:

"Under its police power, the state may reimburse itself for the cost of regulating and supervising a business or commodity by assessing the necessary expenses to such business or commodity which created the necessity for such regulation and supervision.

"Where a statute which purports to assess expenses of regulation and supervision shows on its face that some part of the exaction is to be used for other purposes, the police power is exceeded and the statute is void.

"Senate bill No. 425 ( L. 1957, ch. 43), which directs the transfer of $100,000 from the unexpended balance in the state corporation commission's natural gas

conservation fund to the state general fund, and the second sentences of sections 2, 3 and 5 of senate bill No. 428 (L. 1957, ch. 312; G. S. 1957 Supp., 55-609, 55-711 and 55-131), which direct that twenty per cent of all costs collected by the commission pursuant to certain regulatory statutes be appropriated to the state general revenue fund, show on their face that the amounts transferred and appropriated are to be used indiscriminately for the general expenses and obligations of the state. Senate bill No. 425 and the mentioned portions of senate bill No. 428 violate article 11, section 1 of the Kansas constitution, the commerce clause and the Fourteenth Amendment to the Federal constitution, and are therefore void." (Syl. ¶¶ 1, 2, and 3.)

In reaching the foregoing result this court pointed out the absence of any legislative declaration that the amounts transferred and appropriated to the state general revenue fund are to be used to reimburse other departments and state agencies for indirect assistance rendered the commission and the court declared that "the most reasonable inference to be drawn from both legislative acts is that the $100,000 and the twenty per cent are to be used indiscriminately for all general expenses and obligations of the state." (p. 808.)

*Panhandle* was decided in 1958. Subsequently the legislature enacted K. S. A. 75-3170 which states in part:

"Disposition of fees and moneys paid into state treasury by various state agencies. Upon receipt of the fees and moneys paid into the state treasury in accordance with the provisions of sections 1 to 31, both sections inclusive, of this act, the state treasurer shall credit the same as follows:

"(a) Twenty percent (20%) of the gross receipts received from each particular agency shall be credited to the general fund to reimburse the said fund for accounting, auditing, budgeting, legal, payroll, personnel, and purchasing services, and any and all other state governmental services, which are performed on behalf of each of said agencies by other state agencies receiving general revenue fund appropriations to provide such services. . . ."

Sections 1 and 31 referred to in the statutes are other statutes directing disposition of funds obtained by thirty-one state agencies, each of which authorizes the particular agency to convey funds pursuant to 75-3170. Fees collected under the truth-in-lending act are not mentioned; hence it cannot be said 75-3170 is expressly applicable. Despite this, however, 75-3170 does appear to be direct legislative response to the inference posed in *Panhandle,* that is to say, it constitutes legislative declaration that twenty per cent of regulatory fees collected is a reasonable reimbursement for supportive state services performed for the regulatory agency. It enumerates specific state services, all of which would be applicable in behalf of the consumer credit commission and its staff. The record contains no showing of any kind that twenty per cent of fees

collected does not constitute reasonable reimbursement for other state supportive services and we have no finding, as in *Watson,* that the charge is out of all proportion to the costs involved.

We conclude that the provision for payment into the state general revenue fund of twenty per cent of the fees does not convert the assessment into a revenue measure. To be borne in mind is the fact the parties have stipulated that the eighty per cent to be retained by the consumer credit commissioner will be spent in enforcing the truth-in-lending act as to all non-licensed creditors. Hence we hold that the charges required to be paid under 16-808 (g) constitute a fee for regulatory services and not a tax. Once this determination is reached the proviso in K. S. A. 79-3102 barring further taxation after payment of the mortgage registration fee required thereby upon recording of the mortgage in the office of the register of deeds becomes inapplicable.

The remaining contention is that the charges sought to be assessed under Section 808 (g) are discriminatory and void by reason of the mandate in Article 11, Section 1, of the state constitution that our system of taxation shall be uniform and equal. The argument is that banks, credit unions, finance companies, savings and loan associations and others under the truth-in-lending act are not required to pay these charges and the result is unequal taxation. Here again the premise that these charges amount to taxation is faulty and the constitutional provision relied upon has no application. The fact is the financial institutions mentioned are each regulated by a state agency other than the consumer credit commissioner and each such institution is required to pay fees to its particular regulatory agency. Appellant is not licensed by any state agency. No discrimination or arbitrary or capricious action has been shown.

We find no error in the trial court's action and its judgment is affirmed.

APPROVED BY THE COURT.

KAUL, J., not participating.