No. 20,124.

THE STATE OF KANSAS, ex rel. S. M. BREWSTER, as Attorney-general, etc., *Plaintiff,* v. FRANK CUMISKEY, as State Inspector of Oils, et al., *Defendants.*

SYLLABUS BY THE COURT.

OIL INSPECTION — *Oil Inspection Fee Invalid — Inspection Fees Paid under Protest to be Returned.* The fee of ten cents per barrel chargeable for the inspection of kerosene, gasoline, benzine, and other petroleum products, under section 8 of chapter 200 of the Laws of 1913, is clearly and grossly in excess of the amount reasonably necessary to effectuate the lawful purposes of the act. At the time of its enactment, and ever since that time, the law was, and has been, depended on by the executive and legislative departments of the state government as a revenue measure to bring to the state treasury large sums of money in known excess of the cost of administering the law as an inspection law. The legislature of 1915, although cognizant of the facts and although of the opinion that three cents per barrel was an adequate inspection fee, failed to change the law. The fee is charged and collected for revenue purposes and not merely to defray the cost of inspection. Therefore, that portion of section 8 fixing the fee at ten cents per barrel as an inspection fee is void. Section 1 of article 11 of the constitution requiring a uniform and equal rate of assessment and taxation forbids collection of the fee as a property tax, and no other provision of law authorizes collection of the fee. ·

Original proceeding in mandamus. Opinion filed February 12, 1916. Writ denied.

*S. M. Brewster,* attorney-general, *S. N. Hawkes,* and *John L. Hunt,* assistants attorney-general, for the plaintiff.

*C. A. Braley,* of Kansas City, Mo., and *Fred S. Jackson,* of Topeka, for the Chanute Refining Company *et al.*

*Ossian Cameron,* of Chicago, Ill., for the Great Western Oil Refining Company.

*Albert L. Wilson,* and *Mark T. Wilson,* both of Kansas City, Mo., for the Uncle Sam Oil Company.

*Robert W. Stewart,* of Chicago, Ill., *R. R. Vermilion, Earle W. Evans,* and *Joseph G. Carey,* all of Wichita, for the Standard Oil Company of Indiana.

*J. N. Haymaker, A. V. Roberts,* and *W. D. Jochems,* all of Wichita, for the Wichita Refining Company.

The opinion of the court was delivered by

BURCH, J.: The action is one to test the validity of the oil inspection law. It takes the form of mandamus by the state to compel the state oil inspector to turn into the treasury certain oil inspection fees, which were paid to him under protest. Oil refining companies interested in the fees were made parties and made returns to the writ. Some testimony has been taken, and the cause is presented for decision on the writ, the returns, and the evidence, including some official documents of which the court takes judicial notice. The claim is that the law operates as a revenue measure and not as an inspection law for the protection of the people of the state, and that it violates the constitution of the United States and the constitution of the state of Kansas.

The law in question is chapter 200 of the Laws of 1913, which superseded sections 3938 to 3960, inclusive, of the General Statutes of 1909 (Laws 1899, ch. 170, as amended by Laws 1909, ch. 180), all of which were repealed. Kerosene, gasoline, benzine, and other petroleum products, whether manufactured in this state or not, must be inspected before being offered for sale or used for consumption for illuminating, heating, or power purposes in this state. Inspection is made by a

The State, *ex rel.*, v. Cumiskey.

state inspector, and a sufficient number of deputies to do the work, not exceeding six. The state inspector receives a salary of $2000 per year and his traveling expenses. Each deputy receives a salary of $1200 per year and his traveling expenses. Salaries and expenses are paid by warrants drawn on the state treasury. Inspection is secured by means of a system of penalties. It is a criminal offense for any one to sell or attempt to sell the oils required to be inspected without first having them inspected. Any agent, dealer, or vendor of oils who shall draw off such oils from a car tank or other vessel into a receiving reservoir before inspection and before receiving a certificate or car-tank seal authorizing the oil to be drawn off is guilty of a criminal offense. Every person, company or corporation in the state selling or dealing in oils required to be inspected is obliged to report in full and in detail to the auditor of state all receipts and invoices of oil on or before the tenth of every month. Neglect to do this is a criminal offense. The charge for inspection is ten cents per barrel of fifty gallons, which is paid to the inspector. The inspector forwards his collections to the state inspector, who pays them to the state treasurer, who places them in the general revenue fund. The state inspector is required to make an annual report on or before the twenty-fifth of December of each year of the inspections made by him and his deputies during the preceding year.

The act of 1913 superseded a law providing that inspection should be accomplished by a state inspector and a sufficient number of local inspectors to do the work. A schedule of inspection fees was prescribed, and local inspectors were authorized to keep one-half of their collections up to $50 per month as compensation for their services. The net profits to the general revenue fund of the treasury under that law were as follows:

| | |
|---|---|
| 1909 | $26,820.77 |
| 1910 | 31,337.16 |
| 1911 | 34,067.29 |
| 1912 | 38,189.95 |

Under the new law the net returns to the state, as reported by the state inspector, have been as follows:

| | |
|---|---|
| 1913 | $61,357.12 |
| 1914 | 76,665.68 |
| 1915 | 110,798.37 |

The following were the appropriations for the oil-inspection department made by the legislature of 1913:

|  | 1914. | 1915. |
|---|---|---|
| "State oil inspector | $2000 | $2000 |
| Clerk hire | 900 | 900 |
| Salaries of six deputy oil inspectors | 7200 | 7200 |
| Traveling and individual expenses including rent of office room for deputies and other expenses necessary for the transaction of the business of the office | 4000 | 4000 |
| Total | $14,100 | $14,100" |

(Laws 1913, ch. 26, § 1.)

The legislature of 1915 appropriated the same sums for the same purposes for the years 1916 and 1917.

The law of 1913 did not take effect until April first of that year. The state inspector's report for 1913 covers the year beginning with December, 1912. The recapitulation of that report follows:

| "Barrels of oil inspected | 419,945 |
|---|---|
| Barrels of gaso. inspected | 414,265 |
| Total | 834,210 |
| Amount of fees collected | $80,240.13 |
| Fees deducted for shipments to Mo. | 2,299.90 |
| Total amount of expenses | 18,248.19 |
| Total amount net to State | 61,357.12" |

Recapitulations of the inspector's reports for the years 1914 and 1915 follow:

| (1914) "Barrels of oil inspected | 443,253 |
|---|---|
| Barrels of gaso. inspected | 456,650 |
| Total | 899,903 |
| Total amount of fees collected | $89,990.42 |
| Fees deducted for shipments to Mo. | 4,748.60 |
| Total amount of expenses | 13,324.74 |
| Total amount net to state | 76,665.68" |

| (1915) "Total amount of fees collected | $123,308.29 |
|---|---|
| Fees deducted for shipments to Mo. | 7,635.12 |
| Total amount of expenses | 12,509.92 |
| Total amount net to state | 110,798.37 |
| Barrels of oil inspected | 601,599 |
| Barrels of gas. inspected | 631,481 |
|  | 1,233,080 (plus)" |

For a long time oil was inspected by inspectors appointed by local authorities, mayors and councils of cities and township trustees. In 1889 the office of state oil inspector was created.

In 1909 the scheme for inspection by local inspectors under the supervision of the state inspector was adopted. Before 1909 oil inspection was very profitable to the state. The net profits for the year 1906 were $18,011.95. For 1907 the net profits were $19,990.78. For 1908 the net profits were $20,-210.61. The law of 1909 not only afforded a large revenue to the state in excess of the cost of inspection, but it provided positions for the politically faithful who could be depended on "to look after things" in their respective localities. Year after year the state inspector's reports pointed with pride to a substantial increase in net revenues to the state over preceding years. The law of 1913 corrected the political evils, left the service as adequate and as efficient as it had been, but clung to the profit to the treasury. The state inspector's report to the governor at the close of the year 1913 reads, in part, as follows:

"Prior to April 1, 1913, at which time the present inspection law became effective, the oil inspection department comprised 124 local inspectors, located throughout the state at the various refineries and tank stations. Under the present law, the number of inspectors was reduced April 1st to six, without impairment of the efficiency of the service of the department to the public, and with material financial saving to the state as is hereinafter set out. Six inspectors are now performing the same service as did 124 under the old system and the department has been freed from criticism on the score that its revenues were being dissipated to reward political favorites.

"The six deputy inspectors are located at the various refineries throughout the state, where all oil and gasoline is properly inspected and the inspection certificates issued therefor before it is unloaded from tank cars into receiving tanks, or before it is barreled for shipment. Each of these deputy inspectors is fully provided with all necessary instruments, blanks and records for the proper and expeditious conduct of his duties."

The same matter was inserted in the report made to the governor in 1914, just before the legislature of 1915 assembled. This report also contains the following:

"At this time there are twelve refineries actively in operation in the state. After the first of the year there will be thirteen in operation, twelve of which are operated as independent companies, not connected with the Standard Oil Company, and all of whom are refining and selling oil within the state. The reports on file in the office of this department and in the office of the auditor of state show that during the year ending November 30th, 1914, this department has inspected a total of 443,-

253 barrels of oil and 456,650 barrels of gasoline making a gross total of 899,903 barrels inspected by the department during the year. By referring to former reports of the department, you will note that this is an increase. of 65,693 barrels of oil and gasoline inspected over the previous year.

"No reports of kerosene explosions filed in this office and no reports of inferior gasoline."

The law requires the state auditor to make a biennial report, which he does shortly before the biennial sessions of the legislature. Sections 8873 and 8874 of the General Statutes of 1909 provide as follows:

"In such biennial reports the receipts and expenditures for each of the two fiscal years covered thereby shall be so stated as to correctly show the financial condition of the treasury for each of such years separately. He may also suggest plans for the improvement and management of the public revenues, when he deems it proper to do so.

"It shall be the duty of the auditor to include in his official report a detailed estimate of the expenditures to be defrayed from the treasury for the two next ensuing fiscal years, respectively, specifying therein each object of expenditure, and distinguishing between such as are provided for by permanent or temporary appropriations, and such as are required to be provided by law, and showing the means from which such expenditures are to be defrayed."

In his estimate of probable income to the general revenue fund from fees for the years 1916 and 1917, the state auditor, in his report submitted on December 15, 1914, included the sum of $80,000 for each year from oil inspection fees. In his estimate of appropriations to be made for the same years the auditor recommended only the usual appropriation of $14,100 per annum and proposed a saving of $4200 per year of this sum, as appears by the following suggestion:

"A saving of $4200 a year can be effected without any impairment in efficiency by abolishing the office of state oil inspector, doing away with one of his deputies, and cutting the contingent fund for oil inspection from $4000 to $3000 a year. The office work now being done by the oil inspector and one deputy could be done by the stenographer. This stenographer and the other five deputies could be attached to the state auditor's department.

"As it is now, five deputies and the stenographer do practically all the work. The oil inspector and the office deputy are simply 'middlemen.' They transmit the report of the five deputy inspectors, prepared and checked by the stenographer, to the auditor's office. For this service to the state the oil inspector receives $2000 and the deputy $1200 a year, with traveling expenses. Their work could just as well be done from the office of the state auditor."

The legislature of 1915 made no reduction in the inspection force and made the usual appropriation, but, recognizing the indefensible disparity between the amount of inspection fees received and the cost of inspection, reduced the fee from ten cents per barrel to three cents per barrel. The governor vetoed the bill on two grounds, that the reduction was unreasonable and that it would impair the usefulness of the oil inspection department. The usefulness of the oil inspection department did not depend in any particular on the fees charged for inspection. The number of men employed, the compensation they received and the appropriation for their salaries and expenses remained exactly the same. The reasonableness of an inspection fee is governed by settled principles of law and depends solely upon the relation of cost of inspection to collections for inspection, allowing a fair margin for variation. At three cents per barrel the margin above cost of inspection for the year 1914 would have been more than the total cost of inspection, and the margin for the year 1915 would have been nearly twice the total cost of inspection.

As the production and use of refined petroleum products increase inspection returns increase, and, as the state inspector's reports and the evidence show, increase at a much greater rate than the cost of inspection. Before 1913 oil inspection had become a reliable source of revenue. The act of 1913 gave the treasury more money than ever before above the cost of inspection. Its revenue-producing qualities were fully demonstrated before the legislature of 1915 assembled. The proof shows that the oil refining companies memorialized the two houses of the legislature of 1915 on the subject of the operation of the inspection law. With this and abundant other information before it the legislature formally declared that three cents per barrel was a sufficient inspection fee by passing house bill No. 551. This bill, as originally introduced, provided for a fee of five cents per barrel. It was amended in the house to read three cents per barrel, and was passed by both houses in its amended form. The experience of the year 1915 confirms the legislative declaration, but the law was not changed and fees continue to be charged and collected which bear no rational relation whatever to cost of inspection.

In September, 1914, the refining companies commenced to

pay under protest. This action was commenced in May, 1915. In December, 1915, the state inspector filed an affidavit, to be used as evidence in the case, containing the following:

"Affiant believes, after a careful consideration of all the information in his possession, and from the experience of the administration of his department, that the efficient administration of the work of the department for such full inspection of petroleum and its products, including gasoline and kerosene, will necessitate an appropriation by the state of Kansas of not less than $100,000.00 annually, and that the total revenue from the fees of such inspection, at the rate allowed and provided by law, will not materially exceed the necessary expenses of the administration of said law."

The refining companies cross-examined him. On cross-examination he reduced his estimate, without contention, $30,000. His estimate of $70,000 included the employment of a force of thirty deputies at a salary of $2000 per annum each. In his affidavit he had this to say of the six men actually in the service receiving $1200 per year.

"Affiant further states that all of said deputy inspectors are competent and efficient men, and well skilled in the work of inspecting oils and the products of petroleum required by law to be inspected."

On cross-examination he testified as follows:

"Q. Have you been forced to accept any inspectors under this law that you would not employ under the other law? A. Oh, no."

In 1914, after substantially two years' experience under the act of 1913, the state inspector reported that the efficiency of the service had not been impaired by reducing the number of deputy inspectors to six men, who were accepting $1200 per year as compensation for their services. The auditor was of the opinion that the chief inspector and one deputy might be dispensed with, and that the contingent fund might be reduced $1000 without impairing the efficiency of the service. In 1914 the department inspected nearly 900,000 barrels of oil. In 1915 it inspected more than 1,200,000 barrels of oil. This was done at a cost of less than the annual appropriation of $14,100 per year for the purpose. The court is inclined to think that if so many were necessary, twenty-four new men, competent to do the work, could be secured at the same price as those who are now serving, and that the state inspector's original estimate could safely be reduced $24,000 more, bringing the amount necessary to conduct the department in a proper and

efficient manner down to $46,000 per year. But whether the amount were $46,000 per year or $70,000 per year, the receipts for the year 1915, in which the necessity for an increased appropriation first arose, were $115,673.17, after deducting fees collected for inspecting oil shipped outside the state. If the present inspecting force and the present contingent fund were doubled, the net profit to the state on oil inspection would be enormously greater than the cost of inspection. All the evidence, however, as to what some other inspection law might accomplish and cost is beside the issue. The court has before it a definite inspection law, which the legislature chose to enact, and the results of its operation. If the legislature has adopted a limited and inefficient scheme which costs but little it can not charge and put into its treasury as clear profit on that scheme vast sums of money which might be expended on some other scheme if it were adopted.

Some deputy inspectors include in their affidavits statements that the fees received for inspecting foreign oil brought into the state does not defray the cost of inspection. Objection is made to the consideration of these opinions. Without the objection they would convey no information to the court, unaccompanied as they are by a presentation of the facts, if any there be, upon which they were based. The fact, if it be a fact, that the state is taxing its domestic oil industry to pay the cost of inspecting foreign oil is too important to be established by rule of thumb and might of itself imperil the law. The same impotence characterizes testimony given by the state inspector that the cost of inspecting the product of several small refineries, which he said "do a little once in a while," is greater than the fees received. If facts were produced the court would be able to draw its own conclusions. In no event, however, has the cost of inspecting foreign oil and the products of small refineries been as much as $14,100 per year. Conceding that a considerable part of the annual appropriation has been consumed in such inspection, the collection of the great sums charged for inspecting other oil can not be justified. While certain inescapable inequalities in the operation of inspection laws are to be expected and must be endured, a law can not be an inspection law as to some who are within its provisions and a special property tax law as to others who are also within its provisions.

The object of the law is to promote the safety of persons and property and to protect the people of the state from imposition and fraud. Authority to enact the law is derived from the police power of the state, reserved to it from the grant of powers to the federal government. As an incident of the police power the state may reimburse itself for the cost of inspection by charging the necessary expense upon the business or commodity creating the necessity for inspection. When, however, adequate remuneration has been secured the police power is exhausted. Of course, the books need not precisely balance. It is not possible to determine in advance exactly what sums may be realized from the administration of an inspection law, and there is no objection that some revenue above the cost of inspection may result. Such revenue, however, must be purely incidental to the practical operation of the law, and whenever revenue and not recompense becomes the palpable and unmistakable object the law fails as an inspection law.

The court finds as a fact that the fee of ten cents per barrel chargeable for the inspection of kerosene, gasoline, benzine, and other petroleum products under section 8 of chapter 200 of the Laws of 1913 is clearly and grossly in excess of the amount reasonably necessary to effectuate the lawful purposes of the act; that at the time of its enactment, and ever since that time, the law was, and has been, depended on by the executive and legislative departments of the state government as a revenue measure to bring to the state treasury large sums of money in known excess of the cost of administering the law as an inspection law; that the legislature of 1915, although cognizant of the facts and although of the opinion that three cents per barrel was an adequate inspection fee, failed to change the law; and that the fee is charged and collected for revenue purposes and not merely to defray the cost of inspection. The conclusion of law is that the portion of section 8 fixing the fee at ten cents per barrel as an inspection fee is void; that section 1 of article 11 of the constitution, requiring a uniform and equal rate of assessment and taxation, forbids collection of the fee as a property tax; and that no other provision of law authorizes collection of the fee.

While the legislature probably would not pass an inspection act without providing for the collection of an inspection fee,

the action of the legislature of 1915 clearly demonstrates that the present law would be continued in force without the provision for an inspection fee of ten cents. Consequently no occasion exists for declining to execute any provision of the law except the one held to be void and those subsidiary provisions which depend upon it.

The law is challenged as in contravention of certain provisions of the constitution of the United States. It is not necessary to discuss the very interesting questions thus raised. Certain features of the law are challenged as useless, inefficacious and absurd. The court prefers to leave the determination of these questions to the next legislature.

The inspection fees paid by various defendants under protest should be returned to them. The provisions of the law were such as to coerce inspection, and as a consequence the payment of inspection fees. The statute did not provide for the payment of a reasonable inspection fee, and no officer of the state had authority to accept less than the statutory fee if tendered. There being no valid law for the collection of any sum as an inspection fee, the state has no right to retain the funds indicated.

The peremptory writ is denied, and the custodian of the sums referred to as paid under protest is directed to return them to the proper parties.