The State, *ex rel.*, v. Ross.

No. 20,993.

THE STATE OF KANSAS, ex rel. S. M. BREWSTER, as Attorney-general, etc., *Plaintiff*, v. W. D. ROSS, as State Superintendent of Public Instruction, etc., et al., *Defendants*.

### SYLLABUS BY THE COURT.

1. MOVING-PICTURE FILMS—*Fees Collected for Examination—Not Excessive*. The disproportion between the amount of fees collected under a statute purporting to be an inspection measure and the expenses incurred in its execution will justify a court in holding it to be invalid only when one of two conditions is met: either the discrepancy must be so great that the court is forced to the conclusion that the legislature in the first instance acted in bad faith, and intended to provide a revenue under the pretext of requiring an inspection; or else the legislature must have neglected an opportunity to revise the charges exacted, after experience had shown those previously imposed to be excessive.

2. SAME—*Statute Not a Revenue Measure*. The fact that in the first two years of its enforcement the statute of 1913 providing for the censorship of moving pictures yielded an income of practically four times the cost of its administration is not enough to compel the conclusion that it was intended by the legislature as a revenue measure.

3. SAME—*Additional Clerks to Assist in Inspecting Films*. The provision of the statute referred to authorizing the appointment of additional clerks in the office of the state superintendent of public instruction is held to imply that they were to assist in inspecting and passing upon films, although by the terms of the act that duty was laid upon the superintendent.

Original proceeding in mandamus. Opinion filed July 7, 1917. Writ allowed.

*S. M. Brewster*, attorney-general, *John L. Hunt*, and *S. N. Hawkes*, assistants attorney-general, for the plaintiff.

*L. S. Ferry*, *T. F. Doran*, and *M. F. Cosgrove*, all of Topeka, for the defendants.

The opinion of the court was delivered by

MASON, J.: Some of the fees required of the exhibitors of moving pictures for their inspection under the censorship statute of 1913 (Gen. Stat. 1915, §§ 10774-10781) have been paid to the state superintendent of public instruction under protest, the validity of the act referred to being challenged.

To determine that matter the attorney-general brings this action, seeking by mandamus to obtain an order directing the superintendent to pay to the state treasurer the amount so collected, all claimants of the fund being joined as parties. A number of film companies have answered, contending that the statute is invalid, and asking the return of the money they have paid. Evidence has been taken and the case is submitted for final determination. The principal objection made to the act is that the income derived from the fees collected so far exceeds the expenses of its enforcement as to characterize it as a revenue measure, and that when so regarded it amounts to an undue interference with interstate commerce, and is obnoxious to the provisions of the state constitution requiring the rate of assessment and taxation to be uniform (Const., art. 11, § 1) and relating to the statement of the purpose of a tax in the law imposing it (art. 11, § 4). In an attack made in the federal courts upon this statute it has already been definitely determined that it does not interfere with interstate commerce (*Mutual Film Corp. v. Kansas*, 236 U. S. 248), upon the ground, stated in the opinion in a companion case (*Mutual Film Corp. v. Ohio Indus'l Comm.*, 236 U. S. 230), that the restriction is placed upon the exhibition of films and not upon their transportation. The statute requires the payment of the fee and the approval of the film by the examiners before its exhibition, or its use, which in this case is perhaps the same thing. Viewed as a tax, the charge seems to be laid, not upon the property, but upon the right or privilege of exhibiting it. A tax of that character is not within the operation of the constitutional provision relating to uniformity (*Wheeler v. Weightman*, 96 Kan. 50, 65, 149 Pac. 977) nor of the requirement that the purpose of the tax shall be stated in the law imposing it (*City of Leavenworth v. Booth*, 15 Kan. 627; 37 Cyc. 728-729). The oil-inspection statute, imposing a charge of ten cents a barrel, which was recently held invalid by this court because of the excess of revenue it produced (*The State, ex rel., v. Cumiskey*, 97 Kan. 343, 155 Pac. 47), amounted to a property tax, for it was required to be paid before the oil could be sold or used. Moreover, it involved an interference with interstate commerce.

1. The effect of the statute will be examined, however, upon the assumption that it can be sustained only as an inspection measure. The mere fact that the fees charged under such a statute exceed the expense of its execution is not enough to render it invalid. For instance, the difference between an income of from $70,000 to $75,000 and an outlay of from $55,000 to $60,000 has been said by this court not to afford a sufficient basis for avoiding such a statute. (*The State, ex rel., v. Railway Co.*, 87 Kan. 348, 365, 125 Pac. 98.) To have that effect one of two conditions must be met: either the discrepancy must be so great that the court is forced to the conclusion that the legislature in the first instance acted in bad faith, and intended to produce a revenue under the pretext of requiring an inspection, or else the law-making body must have neglected an opportunity to revise the charges exacted after experience had demonstrated beyond controversy that as previously imposed they were unreasonably and unnecessarily high. These principles are too well established to require extended discussion, but a brief reference will be made to the decisions on the subject. In a case involving the validity of a state law imposing a charge of twenty-five cents a ton upon fertilizers to cover the cost of inspection, interstate commerce being incidentally affected, it was said:

"It does not appear to us that evidence tending to show that money collected from this source was applied to other than the purposes for which it was received should be entered into on this inquiry into the validity of the act. If the receipts are found to average largely more than enough to pay the expenses, the presumption would be that the legislature would moderate the charge. But treating the question whether the charge of twenty-five cents per ton was shown to be so excessive as to demonstrate a purpose other than that which the law declared, as a judicial question we are satisfied that comparing the receipts from this charge with the necessary expenses, such as the cost of analyses, the salaries of inspectors, the cost of tags, express charges, miscellaneous expenses of the department in this connection, and so on, we can not conclude that the charge is so seriously in excess of what is necessary for the objects designed to be effected, as to justify the imputation of bad faith and change the character of the act. (*Patapsco Guano Co. v. North Carolina*, 171 U. S. 345, 353.)

In a dissenting opinion in a case involving an inspection statute, which the majority of the court held to be beyond the

reach of federal interference, the rule applicable if the fact had been otherwise was thus stated:

"Fees can not be imposed for the purpose of inspection upon companies doing an interstate business which are so far in excess of the expenses of such inspection as to make it plain that they were adopted, not as a means of paying such expenses, but as a means of raising revenue." (*Pabst Brewing Co. v. Crenshaw,* 198 U. S. 17, 36.)

The following are later expressions to the same general effect:

"The law being otherwise valid the amount of the inspection fee is not a judicial question; it rests with the legislature to fix the amount, and it can only present a valid objection when it is shown that it is so unreasonable and disproportionate to the services rendered as to attack the good faith of the law." (*McLean v. Denver & Rio Grande R. R. Co.,* 203 U. S. 38, 55.)

"If the trial made of the act establishes the fact to be as asserted, that the exaction in question is excessive, the presumption is that in the orderly conduct of the public business of the state the necessary correction will be made to cause the act to conform to the authority possessed, which is to impose a fee solely to recompense the state for the expenses properly incurred in enforcing the authorized inspection." (*Red "C" Oil Co. v. North Carolina,* 222 U. S. 380, 393.)

"Inspection necessarily involves expense and the power to fix the fee, to cover that expense, is left primarily to the legislature which must exercise discretion in determining the amount to be charged, since it is impossible to tell exactly how much will be realized under the future operations of any law. Beside, receipts and disbursements may so vary from time to time that the surplus of one year may be needed to supply the deficiency of another. If, therefore, the fees exceed cost by a sum not unreasonable, no question can arise as to the validity of the tax so far as the amount of the charge is concerned. And even if it appears that the sum collected is beyond what is needed for inspection expenses, the courts do not interfere, immediately on application, because of the presumption that the legislature will reduce the fees to a proper sum." (*Foote v. Maryland,* 232 U. S. 494, 503.)

In a recent state case it was said:

"It is not necessary that the legislature determine with exact nicety the amount of the inspection charges required to carry its purpose into execution. This is manifestly impossible owing to the varying fluctuations of trade. Mere excess in net surplus revenues is of itself no warrant in disturbing the law, nor would we feel disposed to hold that a flagrant excess in a single year over the expenses would invalidate it. What we do hold is, that under the facts disclosed here, where it appears that the fees are not only excessive but are being continued, yielding each and every year increasing net revenues, the natural operative effect of the inspec-

The State, *ex rel.*, v. Ross.

tion act thus shown is in direct violation of article 1, section 10, of the United States constitution, and consequently void. (*Castle v. Mason*, 91 Ohio St. 296, 305.)

2. The statute now under consideration was enacted in 1913, but owing to the pendency of the case brought in the federal court challenging its validity its enforcement was not begun until April, 1915. It required the payment of two dollars for each film or reel examined. The amount of fees collected for the periods indicated, and the expenses of inspection which are capable of exact ascertainment, were:

|  | Receipts. | Expenses. |
|---|---|---|
| April, 1915, to July, 1915 | $3,669.00 | $832.00 |
| July, 1915, to July, 1916 | 22,876.00 | 6,503.72 |
| July, 1916, to January, 1917 | 8,750.00 | 3,682.51 |
| Totals | $35,295.00 | $11,018.23 |

In this statement of expenses nothing is included for what may fairly be termed the overhead cost, such as the time of salaried state officers—the superintendent of public instruction in passing upon films in the first instance, and of the governor, attorney-general and secretary of state in considering appeals; the furnishing and lighting of a room in the statehouse for the exhibition and examination of films; and some printing and other minor matters. It is to be noted that the disproportion between the revenue and the expenditure is less for the third period than for the second and less for the second than for the first. The law in question has been repealed and superseded by a new act, which contains a provision for a reduction of the examination fee if the returns prove more than sufficient to pay all the costs of its enforcement. (Laws of 1917, ch. 308, § 13.) The discrepancy between the fees collected and the cost of administering the law is indeed large, but is not so excessive as the bare figures given would indicate, for there is no reason why the overhead expenses should not be taken into account. And it is to be borne in mind that in 1913 the legislature necessarily acted without practical experience to guide its judgment as to the number of films likely to be submitted, the amount of work required for their inspection, and the incidental expenses that would be entailed. It is clear that methods of administration were adopted which simplified the procedure and kept the expenses

below what might reasonably have been expected. In view of the presumption in favor of the constitutionality of the statute, and of the good faith of the legislature, the court is of the opinion that the surplus is not so large as to compel or justify the conclusion that its framers enacted it with the real design of producing a revenue, and that the avowed purpose of preventing the exhibition of objectionable films was a mere pretext. The situation is not parallel to, but in sharp contrast with, that presented in the oil-inspection case. There the relation of income to outlay had been established by the experience of many years, and the legislature, "although cognizant of the facts, and although of the opinion that three cents a barrel was an adequate inspection fee, failed to change the law." (*The State, ex rel., v. Cumiskey,* 97 Kan. 343, Syl.) Here the law was changed at the first opportunity—at the first session of the legislature after experience had shown what fee would be necessary to save the public from loss. The suggestion is made that the board of review, which under the new statute is authorized to reduce the fee whenever circumstances justify it, has not exercised the power so granted to it. The presumption is that it will perform its duty under the law, but any failure on its part to do so would affect the validity of the fees collected under the act now in force rather than of those here involved.

3. The defendant film companies also ask the return to them of the fees they have paid on the ground that the statute required inspections to be made by the superintendent of public instruction, whereas in fact they were made by three persons appointed by him for the purpose. The act in terms imposed upon the superintendent the duty of making examinations and approving or rejecting films. But it contained this provision:

"Provided, That for good and sufficient reasons shown, the governor may authorize the employment by the superintendent of public instruction, one or more additional clerks in his office as may be necessary, at a per diem not to exceed three dollars per day for each day actually employed, which per diem shall be paid out of the general revenue fund on warrants duly issued and payable in the same manner as other clerks in said office are paid." (Gen. Stat. 1915, § 10777.)

The duties of the additional clerks referred to were not defined, but we think it is fairly to be inferred that they were

to assist in the performance of the new task laid upon the superintendent—an interpretation the more readily to be adopted because it was manifest that he could not personally inspect all the films submitted and attend to his other official duties.

The judgment will be rendered as asked by the plaintiff, requiring the money paid as inspection fees to be turned over to the state treasurer.

DAWSON, J., not sitting.