The Honorable Laura McClure State Representative, 119th District 202 So. 4th Osborne, Kansas 67473
The Honorable Carl Holmes State Representative, 125th District P.O. Box 2288 Liberal, Kansas 67905
Dear Representatives McClure and Holmes:
You request our opinion regarding the authority of the Legislature to transfer moneys from certain special revenue funds to the state general fund. The specific funds about which you inquire are the healing arts fee fund, the bank commissioner fee fund, the special employment security fund, and the workers compensation fund. You indicate that the 2002 Legislature, by acts of appropriation, ordered various amounts of money to be transferred from these and other funds into the state general fund. Your specific questions with regard to these fund transfers are as follows:
"(1) Is the transfer of money from a dedicated fee fund to the State General Fund permitted by Kansas Statute, or by the Federal or State Constitution?
"If there is appropriate authorization to transfer these funds:
"(2) Is there an obligation to repay the amount transferred?
"(3) If so, within what time frame do the funds need to be repaid?"
We will look at each of these funds and the transfers that were made during the 2002 legislative session. First, however, we believe it would be helpful to review the State's authority to exact these types of fees and assessments.
The power of a state to regulate business and industry for the protection of its citizens derives from its police power.
"The police power is as old as the civilized governments which exercise it. The states existed before the Constitution of the United States, and they possessed the police power before the adoption of that organic document. The states require no specific grant of authority in the Federal Constitution to legislate with respect to matters traditionally within the scope of the police power. Moreover, the Constitution supposes the pre-existence of the police power, and must be construed with reference to that fact."[1]
"The term `police power' is difficult to define precisely, because it is extensive, elastic, and constantly evolving to meet new and increasing demands for its exercise for the benefit of society and to promote the general welfare. It embraces the state's power to preserve and to promote the general welfare and it is concerned with whatever affects the peace, security, safety, morals, health, and general welfare of the community; thus, it cannot be circumscribed within narrow limits, nor can it be confined to precedents resting alone on conditions of the past. The term has been characterized as hazy and ambiguous, and the line separating the legitimate use of the police power from the illegitimate is often incapable of precise delimitation, as it varies from circumstance to circumstance."[2]
While police power is very broad and often difficult to define, there is a definite distinction between a state's police power and its power to levy taxes.
"Broadly speaking, the distinction is that the taxing power is exercised for the purpose of raising revenue and is subject to certain designated constitutional limitations, while the police power is exercised for the promotion of the public welfare by means of the regulation of dangerous or potentially dangerous businesses, occupations, or activities, and is not subject to constitutional restrictions applicable to the taxing power. It may consequently be said that if the primary purpose of a statute or ordinance exacting an imposition of some kind is to raise revenue, it represents an exercise of the taxing power, while if the primary purpose of such an enactment is the regulation of some particular occupation, calling, or activity, it is an exercise of the police power, even if it incidentally produces revenue."[3]
Kansas cases have recognized this distinction between police power and revenue raising measures and that the analysis of the State's authority depends on which power is being exercised.
"At the outset, it is clear that under its police power the state may reimburse itself for the costs of otherwise valid regulation and supervision by charging the necessary expenses to the businesses or persons regulated. (State, ex rel., v. Cumiskey, 97 Kan. 343,352, 155 P. 47; Gt. Northern Ry. v. Washington,300 U.S. 154, 160, 57 S.Ct. 397, 81 L.Ed. 573.) A statute, however, is void if it shows on its face that some part of the exaction is to be used for a purpose other than the legitimate one of supervision and regulation (Gt. Northern Ry. v. Washington, supra, pp. 160-161), or if more than adequate remuneration is secured (State, ex rel., v. Cumiskey, supra; State, exrel., v. Ross, 101 Kan. 377, 166 P. 505). Where interstate commerce is involved and the statute shows that expenses other than those of legitimate supervision and regulation are defrayed from the assessments levied on the regulated businesses, or the income derived from the fees collected so far exceeds the expenses of regulation as to impugn the good faith of the law, it cannot stand, either under the commerce clause or under the Fourteenth Amendment to the Federal constitution. (Gt. Northern Ry. v. Washington, supra, pp. 160-161.)"[4]
Ten years ago in Executive Aircraft v. City of Newton[5] a fuel flowage "regulatory fee" assessed by a city and county for all aviation fuel transported onto airport premises was found to be an illegal tax. Although this was essentially a home rule case, the Court addressed the distinction between a fee and a tax:
"Thus, a tax is a forced contribution to raise revenue for the maintenance of governmental services offered to the general public. In contrast, a fee is paid in exchange for a special service, benefit, or privilege not automatically conferred upon the general public. A fee is not a revenue measure, but a means of compensating the government for the cost of offering and regulating the special service, benefit, or privilege. Payment of a fee is voluntary-an individual can avoid the charge by choosing not to take advantage of the service, benefit or privileged offered.
. . . .
"The distinction between a fee and a tax does not depend upon its label, but rather on the nature and function of the charge. Any applicable statutes must be considered in determining the validity of such a charge."[6]
Thus, it is first necessary to determine whether a particular exaction is an exercise of the police power or is a tax imposed for revenue raising purposes. Then, if it is found to be an exercise of police power, it is necessary to determine whether the amount of the assessment is reasonably approximate to the cost of regulation because once "adequate remuneration has been secured the police power is exhausted."[7] Exact precision is not required;[8] the courts will tolerate some discrepancy as long as there is no evidence of legislative intent to utilize the fee as a revenue raising measure.
"The mere fact that the fees charged under such a [police power] statute exceed the expense of its execution is not enough to render it invalid. For instance, the difference between an income of from $70,000 to $75,000 and an outlay of from $55,000 to $60,000 has been said by this court not to afford a sufficient basis for avoiding such a statute. (Citation omitted.) To have that effect one of two conditions must be met: either the discrepancy must be so great that the court is forced to the conclusion that the legislature in the first instance acted in bad faith, and intended to produce a revenue under the pretext of requiring an inspection, or else the law-making body must have neglected an opportunity to revise the charges exacted after experience had demonstrated beyond controversy that as previously imposed they were unreasonably and unnecessarily high."[9]
The issue of whether regulatory fees were assessed as pretextual revenue sources has been addressed by the Kansas appellate courts in varying circumstances and with varying outcomes. A review of these cases may be instructive.
In the 1916 case of State ex rel. Brewster v. Cumiskey,[10] the Kansas Supreme Court considered the validity of a law requiring inspection of petroleum products and prescribing a schedule of inspection fees, half of which were retained by the inspectors as compensation for their services, and the balance paid to the state treasurer. The Court held "that the fees grossly exceeded the amounts reasonably required to effectuate the lawful regulatory purposes of the act and that the section of the act, which fixed the fees, was void."[11]
The following year in State ex rel. Brewster v. Ross,[12] the Court upheld fees required of exhibitors to defray the cost of inspecting motion picture films, as not so disproportionate to the expenses involved as to constitute a revenue measure. Here, only approximately one third of the fees generated were applied to regulatory expenses. While acknowledging that the discrepancy between the fees collected and the cost of administering the law was "indeed large," the Court went on to say that it was "not so excessive as the bare figures given would indicate, for there is no reason why the overhead expenses should not be taken into account."[13] The Court concluded that the surplus was "not so large as to compel or justify the conclusion" that the law was enacted "with the real design of producing a revenue and that the avowed purpose of preventing the exhibition of objectionable films was a mere pretext."[14]
Several years later, in City of Beloit v. Lamborn,[15] a city ordinance requiring milk distributors to obtain a permit and pay a fee was challenged. The City collected $1,125 a year in fees and paid $480 a year for the services of a state inspector. Finding that other expenses might be involved in the routine regulatory program and that emergency situations would require expenditure of greater sums, the Court found the fees were not grossly disproportionate to the expenses of regulation.
In the 1965 case of Watson v. City of Topeka,[16] fees for depositing building materials on city property adjoining building sites were found to be so grossly excessive as to bear no reasonable relationship to regulatory purposes and thereby exceeded legitimate police powers of the City. Here the approximate $52,000 in fees would have nearly paid the total annual salaries of the building inspector and his assistants as contrasted with only a once a week inspection. Additionally, the fees were deposited in the City's general fund for use in paying general expenses. The Watson Court identified the principle expressed by these prior cases is whether fees established by law are reasonably related to the expenses they were intended to pay. "This," said the Court, "presents a factual question."[17]
In Panhandle Eastern Pipe Line Co. v. Fadely,[18] the Kansas Supreme Court held invalid an appropriation act directing the transfer of twenty percent of all costs collected by the Corporation Commission pursuant to certain regulatory statutes to the state general fund to be usedindiscriminately for the general expenses and obligations of the state. The Court found that this appropriation act showed, on its face, that it was to be used for purposes other than regulating and supervising the industry from which it was collected.[19] Subsequent to the Court's decision in Panhandle Eastern, the Legislature enacted K.S.A. 75-3170
requiring the transfer of twenty percent of the gross receipts from a number of fee funded state agencies to the state general fund "to reimburse the said fund for accounting, auditing, budgeting, legal, payroll, personnel, and purchasing services, and any and all other state governmental services, which are performed on behalf of each of said agencies by other state agencies receiving general revenue fund appropriations to provide such services. . . ."[20] This twenty percent transfer to reimburse the State for the listed expenses was upheld by the Court in Fidelity Inv. Co. v. Hale, absent any showing that twenty percent of fees collected does not constitute reasonable reimbursement for other state supportive services or that the charge is out of all proportion to the costs involved.[21]
The rule of law derived from these cases is this: If an assessment is determined to so exceed the cost of regulation that it is apparent the Legislature is using it as a general revenue raising measure, the overage cannot stand on police power authority.[22] If the assessment is in fact a revenue raising measure, it must be analyzed as such, which may include a determination as to whether it meets Commerce Clause and Equal Protection requirements, as well as any state constitutional requirements applicable to the type of tax that it is.[23] If an assessment exceeds both police power and taxing authority, then it would have to be repaid. With these principles in mind, we turn now to the fund transfers about which you inquire.
 Healing Arts Fee Fund
The Board of Healing Arts is the statutory agency charged with administering the provisions of the Healing Arts Act.[24] The purpose of the Healing Arts Act is to regulate the practice of the healing arts in the interests of public health, safety and welfare, so that the public will be "properly protected against unprofessional, improper, unauthorized and unqualified practice of the healing arts. . . ."[25]
To achieve this purpose, the Board issues licenses or permits to qualified persons wishing to practice the healing arts[26] and takes disciplinary action against those licensees or permit holders found to be in violation of the Healing Arts Act.[27] Protecting the public in this manner is a legitimate exercise of the State's police power.[28]
K.S.A. 2001 Supp. 65-2852 authorizes the Board to assess fees for issuance of licenses and permits,[29] and K.S.A. 65-2846 authorizes, in some instances, the costs of proceedings before the Board to be assessed against the licensee. Neither of these statutes evidences a legislative intent for these assessments to constitute a tax. Rather, the intent appears to have been to support the Board's exercise of its regulatory functions.
In accordance with K.S.A. 2001 Supp. 65-2855, the Board of Healing Arts is to remit all moneys received by or for the Board from fees, charges or penalties to the State Treasurer for deposit in the state treasury. Twenty percent of the amount so deposited is to be credited to the state general fund and the balance is to be credited to the healing arts fee fund.[30]
This twenty percent is designed to reflect Board reimbursement to the State for "accounting, auditing, budgeting, legal, payroll, personnel, and purchasing services, and any and all other state governmental services, which are performed on behalf of"[31] the Board. In the absence of a showing that this amount is grossly disproportionate to the cost of services rendered, it will be considered reasonable.[32]
For fiscal year 2002, the Board's twenty percent general fund credit required by statute amounted to $200,000, in light of the cap imposed by K.S.A. 2001 Supp. 75-3170a(c).[33] In addition, we are told that the Board was also billed in fiscal year 2002 for certain "direct" services, including printing and interest on the printing plant, storage of records at the records center or archives, facilities management services, central mail, personnel training and the Division of Information Systems and Communication (DISC) services, in the amount of $32,628.[34] The Board expects its fiscal year 2003 contribution to the general fund under these provisions to be approximately the same as it was for fiscal year 2002.[35] However, in addition to these exactions, the 2002 Legislature, by appropriation act, directed the transfer of an additional $200,000 from the healing arts fee fund to the general fund "to reimburse the state general fund for accounting, auditing, budgeting, legal, payroll, personnel and purchasing services and any other governmental services which are performed on behalf of the state agency involved by other state agencies which receive appropriations from the state general fund to provide such services."[36] We note that these are the same services for which the Board is required to reimburse the State under K.S.A. 2001 Supp. 75-3170a.
Thus, in fiscal year 2003, under the provisions that currently exist, the Board of Healing Arts will be required to transfer to the state general fund for services reimbursement approximately $430,000 of the applicant and practitioner fees assessed by the Board. By contrast, the information we have been provided regarding the estimated cost of direct and indirect services to the Board indicates that, as mentioned above, only $32,628 was billed for services, and the Board's allocated share of statewide indirect central services for fiscal year 2002 (for federal grant reporting purposes) was $11,851.[37] These costs are not expected to significantly increase in fiscal year 2003. No transfer similar to the additional $200,000 required by the 2002 Legislature for fiscal year 2003 was made in fiscal year 2002 and we are unaware of any legislative pattern of requiring additional transfers.
It appears that the amount required to be paid to reimburse the State for direct and indirect services to the Board may outweigh the actual cost of those services. The situation is further exacerbated by the fact that the Board had to increase fees for fiscal year 2003 to compensate for the additional transfer.[38] However, we are unable to say definitively, without complete accounting information, that such required credits to the general fund constitute a clear, bad faith legislative intent to use regulatory fees for the improper purpose of raising general revenue. First, the statutes and appropriation act that require the Board to make general fund payments explicitly state that such payments are to reimburse the State for services rendered to the Board; thus the provisions are not invalid on their face as was the case with those at issue in Panhandle Eastern Pipe Line Company v. Fadely.[39] Secondly, the amount the Board is billed for certain direct services and the amount the Director of Accounts and Reports has determined to be the Board's allocation of certain indirect services may not cover all the expenses of the State in assisting the Board to administer the Healing Arts Act. The reported allocated share of statewide indirect central services costs for the Board ($11,851) covers only the costs of services from the Department of Administration and the State Treasurer's office, as this is all that is allowed by the federal law establishing such allocations.[40] (We do not know whether there are any federal restrictions on the use of the healing arts fee fund.)
Without a complete accounting to determine whether the Board's functions cost $200,000 more in fiscal year 2003 than in past years, or that $200,000 has been insufficient in past years, the transfer of an additional $200,000 causes concern. However, without more complete information, we are unable to definitively say that the amounts credited to the general fund create a discrepancy between actual cost and amount of reimbursement that is "so great that the court is forced to the conclusion that the legislature in the first instance acted in bad faith, and intended to produce a revenue under the pretext of requiring an inspection,"[41] or that the Legislature has neglected "an opportunity to revise the charges exacted after experience [has] demonstrated beyond controversy that as previously imposed they were unreasonably and unnecessarily high."[42]
 Bank Commissioner Fee Fund
The State Bank Commissioner is charged with administering the banking, savings and loan, mortgage business and consumer credit laws of this State.[43] The purpose of these laws, generally speaking, is to protect consumers.[44] This is a police power function of the State.[45] The Bank Commissioner is authorized to assess fees and costs associated with the administration of these laws.[46] As with the Healing Arts Act provisions, none of these statutes evidences a legislative intent for these assessments to constitute a tax, but rather the intent appears to have been to reimburse the Commissioner for regulatory functions. In fact, the Bank Commissioner, at least with regard to the bank assessment, estimates on an annual basis the amount that will be needed for that fiscal year and, if any overage occurs, the amount is carried forward and the assessment commensurately reduced for the following fiscal year.
All fees collected by the Bank Commissioner are to be deposited in the state treasury and credited twenty percent to the general fund and the balance to the bank commissioner fee fund.[47] Again, according to K.S.A. 2001 Supp. 75-3170a(a), the purpose of crediting twenty percent of the money collected by the Bank Commissioner to the state general fund pursuant to these statutes is "to reimburse the state general fund for accounting, auditing, budgeting, legal, payroll, personnel and purchasing services, and any and all other state governmental services which are performed on behalf of the state agency involved by other state agencies which receive appropriations from the state general fund to provide such services."[48] We are told that the Bank Commissioner credited $200,000 to the general fund in fiscal year 2002 in accordance with subsection (c) of K.S.A. 2001 Supp. 75-3170a and expects to credit the same in fiscal year 2003.
In addition to that amount, the Legislature has ordered the transfer of $500,000 from the bank commissioner fee fund to the state general fund in fiscal year 2003.[49] The stated purpose of this transfer is the same as the purpose of the twenty percent/$200,000 requirement: "to reimburse the state general fund for accounting, auditing, budgeting, legal, payroll, personnel and purchasing services and any other governmental services which are performed on behalf of the state agency involved by other state agencies which receive appropriations from the state general fund to provide such services."[50] As with the Board of Healing Arts, the Bank Commissioner is also billed for and remits payments for certain direct services received from other state agencies, including printing, central mail services, motor pool, personnel training seminars and DISC services.[51] There was no transfer similar to the $500,000 ordered in the 2001 Session showing that this is some sort of a pattern.
We are told that, in light of the additional $500,000 transfer, as with the Board of Healing Arts, the Bank Commissioner found it necessary to increase the assessment on banks for fiscal year 2003. While this transfer also causes concern, for the same reasons cited in our discussion of the Board of Healing Arts fund transfers, in the absence of full accounting information that indicates the cost of direct and indirect support services exceeds the $200,000 requirement by $500,000, or that the $200,000 amount has been insufficient in past years, we are unable to definitively say that these payments to the state general fund from amounts collected by the Bank Commissioner constitute a clear, bad faith legislative intent to use regulatory fees for the improper purpose of raising general revenue.
 Special Employment Security Fund
The Secretary of the Department of Human Resources is charged with administering the Employment Security Law.[52] The purpose and intent behind the Employment Security Law is stated in K.S.A. 44-702:
"The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed."
Pursuant to the Employment Security Law, contributing employers are to pay money to the Secretary of Human Resources for deposit in the employment security fund.[53] Unemployment benefits are then paid out of this fund.[54] Any interest and penalties imposed by the Secretary for violation of the provisions of the Employment Security Law are to be deposited into the special employment security fund created under K.S.A.44-716a(a).[55] No federal dollars are paid into this special fund. Moneys in the special employment security fund are to be used as follows:
"(a) . . . Except as otherwise authorized by this section or by appropriations act, the moneys in this fund may be used by the secretary of human resources only for the payment of costs of administration which are found not to have been properly and validly chargeable against federal grants, or other funds, received for or in the employment security administration fund. In addition to the other purposes for which expenditures may be made from the special employment security fund as authorized by this section or by appropriations act, moneys from this fund may be used to finance activities as deemed necessary by the secretary of human resources for the efficient operation of activities under or the administration of the employment security law, except that (1) no moneys shall be used for such purposes unless the secretary has determined that no other funds are available or can be properly used to finance expenditures for such purposes, and (2) expenditures during any fiscal year for purposes authorized under this section shall not exceed $110,000 except upon approval of the state finance council acting on this matter which is hereby characterized as a matter of legislative delegation and subject to the guidelines prescribed by subsection (c) of K.S.A. 75-3711c and amendments thereto. . . .
. . . .
"The moneys in this fund are hereby specifically made available to replace, within a reasonable time, any moneys received by this state pursuant to section 302 of the federal social security act, as amended, which, because of any action or contingency, have been lost or have been expended for purposes other than, or in amounts in excess of, those necessary for the proper administration of the employment security law. The moneys in this fund shall be continuously available to the secretary of human resources for expenditure in accordance with the provisions of this section and shall not lapse at any time or be transferred to any other fund, except as otherwise authorized in subsection (c) or subsection (d).
"(c) In addition to expenditures authorized by this section, the director of accounts and reports may transfer funds from the special employment security fund to the accounting services recovery fund as provided in K.S.A. 75-3728b and 75-6210 and amendments thereto.
"(d) In addition to expenditures authorized by this section, the director of accounts and reports is directed and authorized to transfer funds from the special employment security fund to the department of human resources federal indirect cost offset fund on July 1 of each year in the amount contained in appropriation bills to be expended from the federal indirect cost offset fund for that fiscal year.
"(e) In addition to expenditures authorized by this section, the director of accounts and reports is directed and authorized to transfer funds from the special employment security fund to the clearing account of the employment security fund to be expended in the payment of interest due employers from erroneously collected contributions or benefit cost payments as provided in subsection (h) of K.S.A. 44-717 and amendments thereto."[56]
While this statute specifically prohibits transfer of moneys in the special employment security fund to other funds except as otherwise authorized therein, the statute also specifically recognizes the authority of the Legislature, through an appropriation act, to make exceptions to that prohibition.[57]
Penalties and interest collected pursuant to enforcement of an act are not the same kind of "fees" as we have discussed for purposes of the Healing Arts Act and the Bank Commissioner's statutes. However, they are similar to the amounts that those agencies assess to reimburse the State for the costs of agency actions taken to enforce those agencies' statutes. It appears that they are intended as assessments to help recover the cost to the State of administering the Employment Security Law, which has been specifically referred to by the Legislature as a police power enactment.[58] We have no authority suggesting that penalties and interest must be analyzed as fees for purposes of determining whether the State has exceeded its police power authority. Nevertheless, we will look at it in those terms for purposes of this opinion.
The special employment security fund does not appear to be one of the funds from which twenty percent is required annually to reimburse the state general fund for indirect services. We have no information regarding payment for direct services from this fund or the cost to the State to administer this fund. However, the Legislature has ordered that $159,140 be transferred from this fund into the state general fund for fiscal year 2002 "to reimburse the state general fund for accounting, auditing, budgeting, legal, payroll, personnel and purchasing services and any other governmental services which are performed on behalf of the state agency involved by other state agencies which receive appropriations from the state general fund to provide such services."[59]
Similar transfers were required in prior fiscal years.[60]
Again, as with the two prior situations discussed, we are unable to say, in the absence of complete accounting information that indicates whether the amount transferred is greatly disproportionate to the cost of direct and indirect services, that this transfer from the special employment security fund to the state general fund constitutes a clear, bad faith legislative intent to use regulatory assessments for an improper purpose. This is particularly true with this fund, as it is composed of penalties and interest as opposed to regulatory fees.
 Workers Compensation Fund
The workers compensation fund is administered by the Commissioner of Insurance.[61] Pursuant to K.S.A. 2001 Supp. 44-566a(b)(1), the Commissioner is to "impose an annual assessment against all insurance carriers, self-insurers and group-funded workers compensation pools insuring the payment of compensation under the workers compensation act" in an amount sufficient "to pay all amounts, including attorney fees and costs, which may be required to be paid from such fund during the current fiscal year, less the amount of the estimated unencumbered balance in the workers compensation fund as of the June 30 immediately preceding the date the assessment is due and payable. . . ." The total amount is to be apportioned among those upon whom it is imposed in an amount bearing the same relation to the total assessment as the amount payable in workers compensation claims by such payer in the immediately preceding calendar year.[62] All moneys received by the Commissioner from this assessment are to be deposited in the state treasury and credited to the workers compensation fund.[63] The workers compensation fund is liable for:
"(1) Payment of awards to handicapped employees in accordance with the provisions of K.S.A. 44-569, and amendments thereto, for claims arising prior to July 1, 1994;
"(2) payment of workers compensation benefits to an employee who is unable to receive such benefits from such employee's employer under the conditions prescribed by K.S.A. 44-532a, and amendments thereto;
"(3) reimbursement of an employer or insurance carrier pursuant to the provisions of K.S.A. 44-534a, and amendments thereto, subsection (d) of K.S.A. 44-556, and amendments thereto, subsection (c) of K.S.A. 44-569, and amendments thereto, and K.S.A. 44-569a, and amendments thereto;
"(4) payment of the actual expenses of the commissioner of insurance which are incurred for administering the workers compensation fund, subject to the provisions of appropriations acts; and
"(5) any other payments or disbursements provided by law."[64]
It has been stated that the primary purpose of the Workers Compensation Act is "the compensation of workers injured in industrial accidents with as little delay as possible and without having to wait for the disposition of collateral issues in which they have no interest."[65]
"The act is founded broadly upon considerations of public policy. Its purpose is to provide protection to workmen within the limits established by the act. . . ."[66] The Act also provides protection to employers who satisfy its requirements.[67] The Act and the fund created by the Act serve police power functions.[68] It appears that the original intent of the assessments imposed under the Act was to pay claims covered by the fund and to reimburse the State for the costs of administering the fund.
We are told that over the past few years, amounts required to be paid from the fund have been on a downward spiral. In response to this, the Commissioner has eliminated the assessments required under K.S.A. 2001 Supp. 44-566a for fiscal year 2003. Additionally, the Legislature appropriated $7,000,000 of the fund to the state general fund.[69] We are told that this was intended to be a one-time transfer to remove excess dollars from the fund; there is no clearly stated legislative intent to assess more than is necessary to pay claims and administer the fund and then siphon off the extra amount into the general fund. As with the previously discussed transfers, the stated purpose of the $7,000,000 is "to reimburse the state general fund for accounting, auditing, budgeting, legal, payroll, personnel and purchasing services and any other governmental services which are performed on behalf of the state agency involved by other state agencies which receive appropriations from the state general fund to provide such services."[70] The workers compensation fund is not one that is required to credit twenty percent or $200,000 to the state general fund annually pursuant to K.S.A. 75-3170
and K.S.A. 2001 Supp. 75-3170a.
We do not believe that by any stretch of the imagination one could seriously argue that it has cost the State an additional $7,000,000 to implement the Workers Compensation Act and administer the workers compensation fund. However, we are unable to say, as a matter of law, that a one-time transfer of this nature is prohibited or that it constitutes a general revenue raising measure that would have to comply with taxing laws. Additional information regarding the amounts assessed over the years, the knowledge of the Legislature regarding the status of the fund, evidence of legislative intent that more be collected than necessary, the actual costs to the State to implement the Act and administer the fund, etc. would need to be collected and analyzed to reach a conclusion in this regard. So, again, without complete accounting information, we are unable to definitively say that this transfer from the workers compensation fund to the state general fund constitutes a clear, bad faith legislative intent to use regulatory assessments for the improper purpose of raising general revenue.
 Conclusion
If a court did find that a transfer grossly exceeds the cost of direct and indirect services, the transfer would be void as an inappropriate exercise of the State's police power and would instead be analyzed as a tax.[71] The issue then would be whether the persons and entities responsible for the assessments have paid or are paying more than their fair share of the State's general operating expenses, and whether the tax complies with other relevant constitutional requirements.
If a successful challenge of any of these or other fund transfers were to be made, the State would likely have to repay the overages. To avoid ending up in this position, we would encourage the Legislature to study the issue of indirect costs and ensure that transfers of money from fee funded agencies into the general fund are not made arbitrarily, but rather bear a relationship to the actual costs borne by the State on behalf of those agencies and the constituencies they regulate or supervise.
In summary, if an assessment so exceeds the cost of regulation that it is apparent the Legislature is using it as a general revenue raising measure, the overage cannot stand on police power authority. If the assessment is in fact a revenue raising measure, it must be analyzed as such, which may include a determination as to whether it meets Commerce Clause and Equal Protection requirements, as well as any state constitutional requirements applicable to the type of tax it is. If an assessment cannot stand on either police power or taxing authority, it would have to be reimbursed. Whether the general fund contribution of a fund administered by an agency performing police power functions so far exceeds the direct and indirect costs incurred by the State on behalf of such agency as to be improper can be determined only as a factual matter on a case-by-case basis. While we do not have sufficient factual information to make this determination for the four scenarios discussed herein, we seriously question whether the agencies involved cost the State in indirect and administrative expenses as much as was taken from their funds during the 2002 Session. If, based on facts presented, a court determined that too much money was taken, and that the individuals and entities who pay fees and assessments to these agencies therefore are paying more than their fair share for the State's general operating expenses, it is likely the court would order those assessments reduced and payments into the general fund reversed.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Julene L. Miller Deputy Attorney General
CJS:JLM:jm
[1] 16A Am.Jur.2d Constitutional Law § 313 (June 2002) (citations omitted).
[2] 16A Am.Jur.2d Constitutional Law § 315 (June 2002) (citations omitted).
[3] 16A Am.Jur.2d Constitutional Law § 318 (June 2002) (citations omitted). See also V-1 Oil Co. v. Utah State Department of PublicSafety, 131 F.3d 1415, 1422-23 (1997).
[4] Panhandle Eastern Pipe Line Co. v. Fadely, 183 Kan. 803, 806-07
(1958). See also R.B. Enterprises, Inc. v. State, 242 Kan. 241, 248-49
(1987); State ex rel. O'Sullivan v. Heart Ministries, Inc., 227 Kan. 244,257 (1980); Fidelity Inv. Co. v. Hale, 212 Kan. 321, 328-30 (1973); Stateex rel. Moore v. City of Wichita, 184 Kan. 196, 200 (1959); Attorney General Opinion No. 86-138.
[5] 252 Kan. 421 (1993).
[6] Id. at 427, 431.
[7] State ex rel. v. Cumiskey, 97 Kan. 343, 352 (1916).
[8] Id.
[9] State ex rel. v. Ross 101 Kan. 377, 379 (1917). See also GreatNorthern Railway Co. v. Washington, 300 U.S. 154, 160, 81 L.Ed. 573, 578
(1937) ("[a] law exhibiting the intent to impose a compensatory fee for such a legitimate purpose [supervision and regulation] is prima facie
reasonable").
[10] 97 Kan. 343 (1916).
[11] Watson v. City of Topeka, 194 Kan. 585, 590 (1965).
[12] 101 Kan. 377 (1917).
[13] Id. at 381.
[14] Id. at 382.
[15] 182 Kan. 288 (1958).
[16] 194 Kan. 585 (1965).
[17] Id. at 591.
[18] 183 Kan. 803 (1958).
[19] Id. at 808.
[20] K.S.A. 75-3170(a). See also K.S.A. 2001 Supp. 75-3170a(a) (a $200,000 cap is currently in place for agencies subject to K.S.A. 2001 Supp. 75-3170a).
[21] 212 Kan. at 329-30. The Court did not address other possible restrictions on such a transfer, such as federal restrictions if the fund in question contains federal grant moneys. See also Attorney General Opinion No. 76-119.
[22] Panhandle Eastern, 183 Kan. at 808.
[23] See Great Northern Railway Co., 300 U.S. at 160, 81 L.Ed. at 578.
[24] K.S.A. 65-2812.
[25] K.S.A. 65-2801. See Kansas State Board of Healing Arts v.Foote, 200 Kan. 447, 453 (1968).
[26] K.S.A. 65-2803.
[27] K.S.A. 2001 Supp. 65-2836.
[28] Meffert v. Medical Board, 66 Kan. 710, 714 (1903); State ex rel.v. Gleason, 148 Kan. 1, 4-5 (1938). See also State ex rel. Moore v. Cityof Wichita, 184 Kan. 196, 200 (1959) ("[g]enerally speaking, the power to license is an exercise of the police power").
[29] See also K.S.A. 65-2909; K.S.A. 2001 Supp. 65-5509; 65-6910(a).
[30] K.S.A. 2001 Supp. 65-2855. See also K.S.A. 2001 Supp. 65-2911(b); 65-5513; 65-6910(c). We assume, for purposes of this opinion, that any portion of the healing arts fee fund that does not end up in the general fund is used solely for the purpose of supervising and regulating the healing arts profession. That portion of the fee has not been questioned.
[31] K.S.A. 2001 Supp. 75-3170a.
[32] Fidelity Inv. Co. v. Hale, 212 Kan. 321.
[33] For a general discussion of the twenty percent transfer requirement and implementation of the $200,000 cap, see Reports ofSpecial Committees to the 1975 Kansas Legislature 1057, Proposal No. 53-Fee Agencies, Reimbursement of General Fund.
[34] Correspondence from Mark W. Stafford, General Counsel for the Board of Healing Arts, July 18, 2002.
[35] Id.
[36] L. 2002, Ch. 204, § 15(b).
[37] Correspondence from Dale Brunton, Director, Division of Accounts and Reports, to Mr. Lawrence T. Buening, Executive Director, Board of Healing Arts, March 15, 2002.
[38] K.A.R. 100-11-1; 100-28a-1; 100-29-7.
[39] Note 17, supra.
[40] United States Office of Management and Budget Circular A-87.
[41] Ross, 101 Kan. at 379.
[42] Id.
[43] K.S.A. 9-1701 et seq.; 9-2209; K.S.A. 2001 Supp. 16a-6-104; 17-5601; 75-1304; K.S.A. 75-1310; K.S.A. 2001 Supp. 75-1315.
[44] See K.S.A. 16a-1-102
[45] Blaker v. Hood, 53 Kan. 499, 507-11 (1894).
[46] See K.S.A. 9-1703(a); 9-2204; K.S.A. 2001 Supp. 16a-6-203; K.S.A. 17-5701 et seq.
[47] See K.S.A. 9-1703(c); 9-2210; K.S.A. 2001 Supp. 16a-2-302(c); 17-5610; 17-5701; 75-1308.
[48] See also K.S.A. 2001 Supp. 16a-2-302(c).
[49] L. 2002, Ch. 204, § 12(h).
[50] Id.
[51] The total for such services was estimated at $134,900.00 for fiscal year 2002.
[52] K.S.A. 2001 Supp. 44-714(a).
[53] K.S.A. 2001 Supp. 44-710(a).
[54] K.S.A. 44-704(a); K.S.A. 2001 Supp. 44-703(k).
[55] K.S.A. 2001 Supp. 44-717(a)(1); K.S.A. 44-719(d)(2).
[56] K.S.A. 44-716a.
[57] Id. at subsection (a). See also L. 2000, Ch. 144, § 126(b).
[58] K.S.A. 44-702.
[59] L. 2002, Ch. 204, § 57(b).
[60] See L. 2000, Ch. 130, § 29(d) (no mention made of the purpose for the transfer); L. 1999, Ch. 132, § 51(c) (no mention made of the purpose for the transfer); L. 1992, Ch. 327, § 62(c) (for the purpose of financing operating expenditures funded from the state general fund); L. 1991, Ch. 13, § 3(c) (refunding a portion of the operating expenditures funded from the state general fund); L 1990, Ch. 26, § 3(c) (operating expenditures). Apparently no transfers were required to be made from this fund to reimburse the state general fund for indirect expenses during the 1993-1998 Sessions.
[61] K.S.A. 2001 Supp. 44-566a(a).
[62] K.S.A. 2001 Supp. 44-566a(b)(1).
[63] K.S.A. 2001 Supp. 44-566a(b)(2).
[64] K.S.A. 2001 Supp. 44-566a(e).
[65] Kuhn v. Grant County, 201 Kan. 163, 171 (1968).
[66] Matlock v. Hollis, 153 Kan. 227, 232 (1941).
[67] See K.S.A. 44-501(b), (g).
[68] See Kansas Malpractice Victims Coalition V. Bell, 243 Kan. 333,363 (1988); Manzanares v. Bell, 214 Kan. 589, 610-11 (1974); Estate ofBaker, 222 Kan. 127, 130 (1977).
[69] L. 2002, Ch. 204, § 74(d).
[70] Id.
[71] See Attorney General Opinion No. 76-119.